UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.  05-60055-CIV-MARRA
Proceeding Ancillary to Case No. 03-80612-CIV-MARRA/JOHNSON

COURT APPOINTED RECEIVER of LANCER
OFFSHORE, INC. and OMNIFUND, LTD.,

        Plaintiff,

vs.

THE CITCO GROUP LTD., CITCO FUND
SERVICES (CURACAO) N.V., AND CITCO
ACCEPTANCE CORPORATION,

        Defendants.

_____/

## THIRD AMENDED COMPLAINT

Plaintiff Marty Steinberg, (the "Receiver") court-appointed Receiver for Lancer

Management Group LLC ("Lancer Management"), Lancer Management Group II LLC ("Lancer

Management II," and collectively with Lancer Management, the "Management Companies")

Lancer Offshore Inc. ("Offshore"), Omnifund Ltd. ("Omnifund," collectively with Offshore, the

"Offshore Funds" or the "Funds"),[1] LSPV Inc., LSPV LLC, Alpha Omega Group Inc., and G.H.

Associates LLC[2], through undersigned counsel, hereby sues Defendants, The Citco Group, Ltd.

("The Citco Group"), Citco Fund Services (Curacao), N.V. ("Citco N.V."), and Citco

Acceptance Corporation ("CAC", and collectively with The Citco Group and Citco N.V.,

"Citco" or the "Defendants" or the "Citco Defendants", and each individually a "Defendant"),

---

[1] On January 29, 1999, Lauer incorporated the Orbiter Fund, Ltd. ("Orbiter") as an IBC in the BVI.  On September 30, 1999, Lauer incorporated The Viator Fund ("Viator") as an IBC in the BVI.  On April 2, 2002, Lauer formed Omnifund Ltd. as an IBC in the BVI by merging Orbiter and Viator.  Furthermore, Orbiter and Viator are included in the definition of the "Offshore Funds".

[2] Lancer Management Group LLC, Lancer Management Group II LLC, Lancer Offshore Inc., Omnifund Ltd., LSPV Inc., LSPV LLC, Alpha Omega Group Inc., and G.H. Associates LLC are referred to collectively as the "Receivership Entities."

and alleges upon information and belief the following:

## I. **INTRODUCTION**

1. The Receiver brings this action, on behalf of each of the Receivership Entities, to avoid transfers made from Offshore, Omnifund/Orbiter and Viator, to CAC and Citco N.V.  The transfers are set forth on **Exhibit "A"**.

2. Certain of the transfers at issue were made ostensibly to pay administrative fees allegedly owing to Citco N.V.

3. Other transfers at issue were made ostensibly to pay director fees for directors that Citco N.V. and The Citco Group placed on the boards of the Offshore Funds.

4. For the reasons set forth below, with respect to transfers made to CAC, the Receiver seeks to recover from (i) CAC, on the basis that (a) it is the initial transferee that received the transfers, or alternatively, (b) it is the party for whose benefit the initial transfers were made; (ii) Citco N.V., on the basis that (a) it is the party for whose benefit the initial transfers were made; (b) it is a subsequent transferee; or alternatively, (c) it is vicariously liable for the transfers made to CAC; and/or (iii) The Citco Group, on that basis that: (a) it is the party for whose benefit the initial transfers were made; (b) it is a subsequent transferee, or alternatively, (c) it is vicariously liable for the transfers made to CAC.

5. For the reasons set forth below, with respect to transfers made to Citco N.V., the Receiver seeks to recover from (i) Citco N.V., on the basis that (a) it is the initial transferee that received the transfers, or alternatively, (b) it is the party for whose benefit the initial transfers were made; (ii) The Citco Group, on the basis that (a) it is the party for whose benefit the initial transfers were made; (b) it is a subsequent transferee; or alternatively, (c) it is vicariously liable for the transfers made to Citco N.V; and/or (iii) CAC, on the basis that (a) it is the party for

whose benefit the initial transfers were made; (b) it is a subsequent transferee, or alternatively, (c) it is vicariously liable for the transfers made to Citco N.V.

6.      In addition, the Receiver brings this action on behalf of the Receivership Entities against each of the Defendants under theories of unjust enrichment.

## II.  THE PARTIES

### A.    The Receiver

7.      The Receiver is a citizen of the State of Florida.

8.      On July 8, 2003, the Securities and Exchange Commission filed in this Court a Complaint for Injunctive and Other Relief against Michael Lauer ("Lauer"), Lancer Management, Lancer Management II, Offshore., Omnifund., LSPV Inc., and LSPV LLC, initiating Case No. 03-80612-CIV-MARRA/JOHNSON (the "Receivership Case").

9.      On July 10, 2003, this Court entered an Order Appointing Receiver (the "Receivership Order") in the Receivership Case, which, among other things, placed Lancer Management, Lancer Management II, Offshore, Omnifund, LSPV Inc., and LSPV LLC under the auspices of the Receiver.

10.     Paragraph 1 of the Receivership Order directs the Receiver to "[t]ake immediate possession of all property, assets and estates of every kind of [the Receivership Entities] … including, but not limited to … stocks, bonds, debentures and other securities … and to administer such assets pending further order of this Court … "

11.     Paragraph 2 of the Receivership Order directs the Receiver to:

> Investigate the manner in which the affairs of Lancer Management, Lancer Management II, Offshore, Omnifund, Offshore LSPV, and Partners LSPV were conducted and institute such actions and legal proceedings, for their benefit and on their behalf, and on behalf of the Funds' investors and other creditors, as the Receiver deems necessary … against any transfers of monies or other proceeds directly or indirectly traceable from investors in the Funds; provided such actions may include … recovery and avoidance of fraudulent transfers under Florida Statute § 726.101, et seq. or other state law…

12.     On September 3, 2003, the Court entered an Order expanding the terms of the Receivership Order to include Alpha Omega Group Inc. and G.H. Associates LLC.

13.     The Receivership Order and Order Expanding Receivership empower the Receiver to bring this action on behalf of each of the Receivership Entities.

14.     This Third Amended Complaint is ancillary to Case No. 03-80612-CIV-MARRA pursuant to Article IX of the Court's Case Management Order dated January 8, 2004 in Case No. 03-80612-CIV-MARRA.

15.     The Plaintiff and the Receivership Entities have their principal place of business at 1111 Brickell Avenue, Suite 2500, Miami, Florida  33131.

**B.     The Defendants**

**1.     The Citco Group**

16.     The Citco Group is an integrated financial services holding company that operates through numerous wholly-owned subsidiaries.  According to a recent marketing brochure for The Citco Group, the services offered by The Citco Group include corporate and fiduciary services, fund administration and shareholder services, custody and banking services, fund advisory and brokerage services, and international pension services.

17.     The Citco Group does not earn any revenue independent of the revenue generated by its subsidiaries, and it serves as the vehicle by which its operating subsidiaries procure business from and conduct extensive fund management services for funds operated from within the United States and around the world.

18.     The Citco Group's principal place of business is at Corporate Centre, West Bay Road, Grand Cayman, Cayman Islands-British West Indies.

19.     The Citco Group maintains offices throughout the United States, including two offices in Miami, Florida and one in Fort Lauderdale, Florida.  The Citco Group also has offices located in Pennsylvania and New York.  In serving the interests of its operating subsidiaries, The Citco Group and its immediate subsidiaries conduct extensive business, administrative and marketing operations within the United States and the Southern District of Florida.  In fact, three of The Citco Group's United States subsidiaries are Florida corporations with their respective principal places of business located in the Southern District of Florida.  These subsidiaries include Citco Technology Management, Inc., which has its principal place of business located in Fort Lauderdale, Florida, and maintains all of The Citco Group's technology infrastructure.  In addition, Citco Corporate Services, Inc. shares its principal place of business in Miami, Florida with Citco Fund Services (USA) Inc. ("Citco USA") and serves as Citco USA's registered agent in Florida.

20.     The Citco Group also maintains offices outside the United States and around the world, including offices in Curacao.

21.     The Citco Group holds its network of subsidiaries out as the world's top providers of hedge fund administration services.  The Citco Group claims that its wholly owned operating subsidiaries administer more than 1,000 funds worldwide - almost 30% of the global hedge fund

management market, allegedly representing a combined NAV[3] of more than $110 billion.

22.     Citco N.V. serves as The Citco Group's actual and apparent agent.

23.     CAC serves as The Citco Group's actual and apparent agent.

24.     Citco N.V. holds itself out as an office of The Citco Group.  Indeed, on The Citco Group's website (*http://www.citco.com/locations.jsp*), Citco N.V. is listed as an office of The Citco Group network.  All of The Citco Group's subsidiaries, divisions, and offices are referred to throughout the website only as "Citco."  Similarly, all of The Citco Group subsidiaries use the same "Citco" logo on their letterhead and, on each of The Citco Group subsidiaries' stationary, lists all the places where The Citco Group affiliates are located - again emphasizing the integrated, global nature of The Citco Group.

25.     The Citco Group represents that its operating subsidiaries combined constitute a "global fund administrator" and that its operating subsidiaries' ability to administer funds in offices throughout the world renders the combined enterprise able to provide a "consistent service platform."

26.     The Citco Group asserts that its operating subsidiaries allow their personnel "the ability to transfer between offices and divisions" in order to maintain consistent levels of performance worldwide.

27.     Substantially all information regarding hedge funds administered by any of The Citco Group's offices is maintained in a centralized database that can be accessed by the fund manager.   Indeed, the Citco website (*http://www.citco.com/funds/services_online.htm*) touts: "This online reporting service is available to Fund Managers of Funds administered by *any* of the Citco Fund Services offices." (Emphasis supplied).

---

[3] As hereinafter described in detail, the term "NAV" refers to net asset value.

28.     The Citco Group's website also contains a brochure that describes a sophisticated, integrated computer system containing all client information that is located in Fort Lauderdale, Florida, and operated by Citco Technology Management, Inc.:

> Citco's dedicated Information Technology Group, based in Fort Lauderdale, Florida is responsible for maintaining and monitoring all software and hardware configurations, and network support. The group also maintains Citco's exclusive database of security information (CDS Citco Data Source), providing prices and corporate actions for US and non-US securities, with integrated cross-reference identification codes, using multiple vendors such as Interactive Data Corporation (IDC), Reuters, Bloomberg and Telekurs. Each office is set up with a dedicated team of on-site IT staff to monitor daily operations and tailor needs of our clients.

*See http://www.citco.com/funds/CitcoFundServicesBrochure.pdf.*

29.     The Citco Group holds itself out as an integrated network of entities that is an expert in valuing securities.

30.     The managing director of each office of The Citco Group that provides fund administration services – including Citco N.V. – reports to William Keunen ("Keunen"), the Director of Fund Services for The Citco Group.  Keunen, in turn, reports to the four person executive committee for The Citco Group.

31.     In his role with The Citco Group, and operating from one of The Citco Group's Miami offices, Keunen received and responded to both internal and external e-mail inquiries regarding the Offshore Funds, received and responded to correspondence regarding the Offshore Funds, and engaged in meeting and telephone discussions with various Lancer and Citco personnel regarding the Offshore Funds.  Further, Keunen reported to all Citco directors regarding the issues that Citco's internal audit department raised in May 2002 regarding the problems with the Lancer portfolio and fund valuation.  Finally, Keunen directed the dissemination of erroneous NAV's associated with the Offshore Funds into the United States,

New York, and Florida.

32.     Keunen initiated contact in June 2001 with the New York office of PwC, the international auditing firm whose Curacao office was responsible for auditing the Offshore Funds.  Keunen made this contact to engage in a conference call with PwC officials regarding fund valuation issues.

33.     Keunen is an officer of Citco USA and is resident in Citco USA's Miami office.

34.     In addition, Citco USA maintains a sophisticated, trademarked software system called "Ephesus," which has "fully integrated general ledger capabilities … ."  This software system includes "an order entry and order acceptance based system to process subscriptions, redemptions (including cash tracking), transfers and switches," and a sophisticated intranet.  This software is available to and used by the rest of The Citco Group's entities around the world, including Citco N.V.

35.     In fact, in a letter dated July 31, 1999, and on Citco Technology Management, Inc. letterhead, The Citco Group reassured Citco N.V. clients regarding Year 2000 compliance issues with Ephesus and other computer-related issues.  The letter stated, in relevant part:

> Year 2000 readiness statement for *Citco Funds Services* as of July 31st 1999:
>
> The purpose of this letter is to update you on the progress *Citco* is making with Year 2000 compliance.
>
> *            *            *
>
> *Citco's* core proprietary systems, Ephesus, our Fund Accounting Package, and Global Shareholder System (GSS), our Shareholder Record keeping system already store 4 digit years.
>
> *            *            *
>
> As a result of these efforts, *Citco Funds Services* is pleased to advise you that we are confident we will have no significant disruptions to our internal systems.

\*       \*       \*

> If you require additional information, please feel free to call me at our Ft. Lauderdale USA office at 954-351-7275 or E-Mail me at SHEIBLUM@CITCO.COM.

(emphasis added).

36.     The Citco Group selected its employees Anthony Stocks ("Stocks") and John Verhooren ("Verhooren") to serve on the Offshore Funds' boards to ensure The Citco Group's control over every aspect of the Offshore Funds' management and to increase Citco's administrative fees.  Specifically, The Citco Group directed the Funds' policies and procedures via its employees Stocks and Verhooren.  Yet, the Offshore Funds paid The Citco Group, through Citco N.V. and/or CAC, the fees for Stocks' and Verhooren's services on the Funds' boards.

### 2.     Citco N.V.

37.     Citco N.V. is a Curacao-based wholly owned operating subsidiary of The Citco Group.  It is a business entity organized and existing under the laws of the Netherlands Antilles, having places of business at Kaya Flamboyan 9, P.O. Box 812, Curacao, Netherlands Antilles and Citco Building, Wickams Cay, Road Town, Tortola, British Virgin Islands ("BVI").[4]

38.     Citco N.V. performs extensive fund management services for investment funds operated from the United States.

39.     Citco N.V. performed extensive fund management services for the Offshore Funds while those funds were operated and managed by Lauer and Lancer Management Group, LLC ("Lancer Management") from executive offices located in New York City and Connecticut. These services included, but were not limited to:

---

[4] Citco Fund Services-BVI/Citco B.V.I. Ltd. share this Tortola, British Virgin Islands address with Citco N.V. and are also the registered agent for Omnifund and Offshore.

a.      Collecting thousands of wire transfers from investors – both new investors and investors increasing their investment – through a bank account located in New York at Republic National Bank of New York, now known as HSBC Bank ("HSBC"), in an account held in the name of Citco Banking Corporation N.V.;

b.      Providing a bank account with Citco Banking Corporation, N.V., located in New York, for the Offshore Funds;

c.      Continuously and systematically issuing NAV statements to investors based in the United States, including at least one investor in Florida;

d.      Issuing thousands of NAV statements to New York-based Lancer personnel;

e.      Continuously and systematically issuing invoices to New-York based Lancer offices;

f.      Communicating on a systematic and continuous basis with the New York and Connecticut Lancer offices regarding issues of fund governance, subscriptions, and valuation;

g.      Communicating on a systematic and continuous basis with United States and Florida investors and associated third parties as a conduit for information from Lauer and the Offshore Funds, including without limitation letters from Lauer, confirmation of subscriptions and redemptions, reviews of the Offshore Funds; status of the investors' accounts, and responses to investor inquiries;

h.      Continuously and systematically communicating and coordinating with Citco USA and Citco Technology Management Inc. in Florida to provide portfolio valuation services and technology infrastructure;

i.      Selecting and placing its employees, Kieran Conroy ("Conroy") and Duncan Quilligan ("Quilligan") on the Offshore Funds' boards to serve as directors in exchange for payment from the Offshore Funds to Citco N.V.; and

j.      Controlling and directing the omissions, actions, decisions, and votes of its employees Conroy and Quilligan on the Offshore Funds' boards.

40.      Citco N.V. is the largest division of the Citco Fund Services group.  Citco N.V.

provides full service administration to 205 funds, totaling $44.9 billion in assets and employing 115 people.

41.     When requesting payment from Lancer for fund administration services, Citco N.V. provided bank wire transfer information for such payments to be made.  These payments could be sent to one of three places: a Citco Banking Corporation account in Curacao, a bank account at a Citibank branch in New York, New York, or a Citibank-owned post office box located in Philadelphia, Pennsylvania.  Citco N.V. continuously and systematically issued these invoices via fax to Lancer's New York offices.

42.     Citco N.V. issued these invoices to the Offshore Funds for administrative services including, without limitation, "preparation of net asset value statements, acting as the Fund's Registrar and Transfer Agent, maintaining the Shareholders Register, communications with Shareholders, Auditors and Third Parties, arranging of the payment of fees and other expenses."

43.     Citco N.V. is the alter ego and mere instrumentality of The Citco Group.

44.     CAC serves as Citco N.V.'s actual and apparent agent.

45.     The Citco Group used Citco N.V. for an improper purpose, including, without limitation, directing Citco N.V. to send out the erroneous NAV's and directly participating in the Offshore Funds' administration to wrongfully inflate their fees that were directly linked to the amount of the bogus NAV's.

46.     Citco N.V. served as The Citco Group's actual agent.  The Citco Group acknowledged that Citco N.V. would act on its behalf by intervening in the administration of the Offshore Funds.  These acknowledgements include, without limitation, The Citco Group's (i) responding to emails regarding the Offshore Funds; (ii) engaging in meetings and telephone discussions with various Citco and Lancer personnel regarding the administration of the Offshore

Funds; and (iii) placing its Director Stocks on the boards of the Offshore Funds for compensation.

47.     Citco N.V. accepted the responsibility of administering the Offshore Funds by performing extensive fund management services and by being retained to perform administrative services.

48.     The Citco Group exercised significant control over and even dominated Citco N.V.  For instance, The Citco Group decided issues related to the Offshore Funds at is executive committee meetings and directed Citco N.V. to send out the erroneous NAV's despite knowledge of valuation problems.

49.     Citco N.V. also served as The Citco Group's apparent agent.  The Citco Group represented to the Offshore Funds that Citco N.V. had the authority to act on its behalf by intervening in the administration of the Offshore Funds.  These representations include, without limitation, (i) controlling Citco N.V; (ii) asking for explanations of problematic valuations from Lauer and Lancer; (iii) directing the dissemination of bogus NAV's; (iv) formulating and implementing the bogus valuations of the Offshore Funds; (v) responding to investor inquiries; and (vi) communicating with the Offshore Funds' auditors regarding valuation issues.

50.     As a result, the Offshore Funds and their investors relied heavily on these representations as well as the business acumen, industry reputation, other oversight services the Citco Defendants represented they would provide.  Further, the Offshore Funds detrimentally changed their position in reliance on these representations by retaining Citco as its administrator.

### 3.     Citco Acceptance Corporation

51.     CAC's principal place of business is at West Bay Road, Grand Cayman, Cayman Islands-British West Indies.  At all relevant times, CAC utilized West Bay Road, P.O. Box

31106-SMB, Grand Cayman, Cayman Islands as the address for the receipt of payments from the Receivership Entities.  CAC shares this address with Citco Fund Services (Cayman Islands) Ltd. and Citco Trustees (Cayman) Ltd.

52.     CAC served as the corporate entity for The Citco Group and Citco N.V. to receive funds from the Receivership Entities.

53.     CAC is a mere instrumentality and alter ego of Citco N.V., and Citco N.V. has operational control over CAC.

54.     Citco N.V. used CAC for an improper purpose to collect fees for its services from the Offshore Funds, despite the fact that the continued performance of these services constituted knowing, intentional, conscious, voluntary, willful, and/or grossly negligent breaches of its contractual and fiduciary duties to the Offshore Funds.

55.     CAC served as Citco N.V.'s actual agent.  Citco N.V. acknowledged that CAC would act on its behalf.  These acknowledgements include, without limitation, the authorization by Citco N.V. for CAC to collect fees for its services from the Offshore Funds..

56.     CAC also served as Citco N.V.'s apparent agent.  Citco N.V. represented to the Offshore Funds that CAC had the authority to act on its behalf.  These representations include, without limitation, the authorization by Citco N.V. for CAC to collect fees for its services from the Offshore Funds.

57.     CAC is a mere instrumentality and alter ego of The Citco Group, and The Citco Group has operational control over CAC.

58.     The Citco Group used CAC for an improper purpose to collect fees for its services from the Offshore Funds despite the fact that the performance of these services constituted knowing, intentional, conscious, voluntary, willful, and/or grossly negligent breaches of its

contractual and fiduciary duties to the Offshore Funds.

59.    CAC served as The Citco Group's actual agent.  The Citco Group acknowledged that CAC would act on its behalf.  These acknowledgements include, without limitation, the authorization by The Citco Group for CAC to collect fees for its services from the Offshore Funds.

60.    CAC also served as The Citco Group's apparent agent.  The Citco Group represented to the Offshore Funds that CAC had the authority to act on its behalf.  These representations include, without limitation, the authorization by The Citco Group for CAC to collect fees for its services from the Offshore Funds..

61.    Citco N.V. and The Citco Group used CAC for an improper purpose to collect inflated fees from the Offshore Funds by willfully, knowingly, consciously, recklessly, and/or with gross negligence breaching their duties of care by:  failing to use reasonable skill and care to value the NAV's in accordance with GAAP; failing to use reasonable skill and care to independently price the Offshore Funds; failing to use reasonable skill and care to independently verify the valuations stated by Lauer; failing to use reasonable skill and care to discover the incorrect valuations and NAV calculations reported by Lauer; failing to identify and act on conflicts of interest and the "red flags" in the valuation process; and failing to use reasonable skill and care to report the incorrect valuations and NAV calculations reported to the independent directors on the board of directors of the Offshore Funds (the "Independent Directors"), investors, or appropriate authorities.

62.    On behalf of The Citco Group and Citco N.V., CAC continuously and systematically performed services for the Offshore Fund, which were based out of New York. Specifically, CAC was involved with collection of payment for invoices to be paid to Citco's

Citibank N.A., New York bank account.

### III.  PROOFS OF CLAIM

63.     On April 1, 2004, the Receiver filed a proof of claim in the Receivership Case against Offshore, on behalf of all of the Receivership Entities asserting "[p]otential, contingent, unliquidated claim[s] for services rendered, money or property loaned and/or transferred, or for money owed on other grounds currently unknown to Claimant" ("Offshore Proof of Claim").

64.     On April 1, 2004, the Receiver filed a proof of claim in the Receivership Case against Omnifund, on behalf of all of the Receivership Entities and Partners, asserting "[p]otential, contingent, unliquidated claim[s] for services rendered, money or property loaned and/or transferred, or for money owed on other grounds currently unknown to Claimant" ("Omnifund Proof of Claim").[5]  Because Omnifund is the successor in interest to Orbiter and Viator, the Omnifund Proof of Claim includes claims against those entities as well.

### IV.  STANDING

65.     The Receiver seeks to avoid the transfers made by the Receivership Entity listed as the "Transferor" on **Exhibit "A,"** which is incorporated by reference, namely: Offshore, Omnifund / Orbiter,[6] and Viator.

**A.      Offshore Transfers**

66.     The Receiver brings this action on behalf of each of the Receivership Entities, and on behalf of Partners, to avoid and recover the transfers made by Offshore listed on Column 4 of **Exhibit "A"** ("Offshore Transfers") to the Defendant that received the Offshore Transfers listed

---

[5] On April 1, 2004, the Receiver also filed proof of claims in the Receivership Case against each of LMG, LMG II, Offshore LSPV, Partners LSPV, AOG and GH, on behalf of all of the Receivership Entities and Partners, asserting "[p]otential, contingent, unliquidated claim[s] for services rendered, money or property loaned and/or transferred, or for money owed on other grounds currently unknown to Claimant" ("Other Proofs of Claims").

[6] *See* n. 1, *supra.*

on Column 2 of **Exhibit "A"** ("Offshore Transferees").

67.     The Receiver has standing to bring this action on behalf of each of the Receivership Entities to avoid and recover the Offshore Transfers.

68.     In each instance for which the Receiver seeks to avoid and recover the Offshore Transfers, Offshore is the "debtor" for purposes of the relevant fraudulent transfer statutes and laws.

69.     In each instance for which the Receiver seeks to avoid and recover the Offshore Transfers, the Receiver, as receiver of one or all of the Receivership Entities, as delineated below, or as responsible person for Partners, is the "creditor" for purposes of the relevant fraudulent transfer statutes and laws.

70.     The Receiver, as receiver of each of the Receivership Entities, and as responsible person for Partners, is a creditor of Offshore on the basis of the Offshore Proof of Claim.

71.     The Receiver, as receiver of the post-receivership Offshore, is a creditor of the pre-receivership "zombie" Offshore managed by Lauer, on the basis that the pre-receivership "zombie" Offshore managed by Lauer dissipated the assets of Offshore by virtue of the Offshore Transfers.

72.     The Receiver, as receiver of the post-receivership Offshore, is a creditor of the pre-receivership "zombie" Offshore managed by Lauer, on the basis that the Receivership Order gives him the right to institute "actions…against any transfer of monies directly or indirectly traceable from investors in [Offshore]," and the pre-receivership "zombie" Offshore managed by Lauer made the Offshore Transfers that are directly or indirectly traceable from investors in Offshore.

73.     The Receiver as receiver of Offshore, is a creditor of the Offshore Transferees on

16

the basis that the Offshore Transferees received monies dissipated by Offshore.

74.     The Receiver, as receiver of Offshore, is a creditor of the Offshore Transferees on the basis that the Receivership Order gives him the right to institute "actions…against any transfer of monies directly or indirectly traceable from investors in [Offshore]," and the Offshore Transferees received the Offshore Transfers that are directly or indirectly traceable from investors in Offshore.

**B.     Omnifund Transfers**

75.     The Receiver brings this action on behalf of each of the Receivership Entities, and on behalf of Partners, to avoid and recover the transfers made by Omnifund listed on Column 4 of **Exhibit "A"** ("Omnifund Transfers") to the Defendant that received the Omnifund Transfers listed on Column 2 of **Exhibit "A"** ("Omnifund Transferees").

76.     The Receiver has standing to bring this action on behalf of each of the Receivership Entities and Partners to avoid and recover the Omnifund Transfers.

77.     In each instance for which the Receiver seeks to avoid and recover the Omnifund Transfers, Omnifund is the "debtor" for purposes of the relevant fraudulent transfer statutes and laws.

78.     In each instance for which the Receiver seeks to avoid and recover the Omnifund Transfers, the Receiver, as receiver of one or all of the Receivership Entities, as delineated below, or as responsible person for Partners, is the "creditor" for purposes of the relevant fraudulent transfer statutes and laws.

79.     The Receiver, as receiver of each of the Receivership Entities, and as responsible person for Partners, is a creditor of Omnifund on the basis of the Omnifund Proof of Claim.

80.     The Receiver, as receiver of the post-receivership Omnifund, is a creditor of the

pre-receivership "zombie" Omnifund managed by Lauer, on the basis that the pre-receivership "zombie" Omnifund managed by Lauer dissipated the assets of Omnifund by virtue of the Omnifund Transfers.

81.     The Receiver, as receiver of the post-receivership Omnifund, is a creditor of the pre-receivership "zombie" Omnifund managed by Lauer, on the basis that the Receivership Order gives him the right to institute "actions…against any transfer of monies directly or indirectly traceable from investors in [Omnifund]," and the pre-receivership "zombie" Omnifund managed by Lauer made the Omnifund Transfers that are directly or indirectly traceable from investors in Omnifund.

82.     The Receiver as receiver of Omnifund, is a creditor of the Omnifund Transferees on the basis that the Omnifund Transferees received monies dissipated by Omnifund.

83.     The Receiver, as receiver of Omnifund, is a creditor of the Omnifund Transferees on the basis that the Receivership Order gives him the right to institute "actions…against any transfer of monies directly or indirectly traceable from investors in [Omnifund]," and the Omnifund Transferees received the Omnifund Transfers that are directly or indirectly traceable from investors in Omnifund.

**C.     Viator Transfers**

84.     The Receiver brings this action on behalf of each of the Receivership Entities, and on behalf of Partners, to avoid and recover the transfers made by Viator listed on Column 4 of **Exhibit "A"** ("Viator Transfers") to the Defendant that received the Viator Transfers listed on Column 2 of **Exhibit "A"** ("Viator Transferees").

85.     The Receiver has standing to bring this action on behalf of each of the Receivership Entities and Partners to avoid and recover the Viator Transfers.

86.     In each instance for which the Receiver seeks to avoid and recover the Viator Transfers, Viator is the "debtor" for purposes of the relevant fraudulent transfer statutes and laws.

87.     In each instance for which the Receiver seeks to avoid and recover the Viator Transfers, the Receiver, as receiver of one or all of the Receivership Entities delineated below, or as responsible person for Partners, is the "creditor" for purposes of the relevant fraudulent transfer statutes and laws.

88.     The Receiver, as receiver of each of the Receivership Entities, and as responsible person for Partners, is a creditor of Viator on the basis of the Omnifund Proof of Claim.[7]

89.     The Receiver, as receiver of the post-receivership Omnifund, is a creditor of the pre-receivership "zombie" Viator managed by Lauer, on the basis that the pre-receivership "zombie" Viator managed by Lauer dissipated the assets of Viator by virtue of the Viator Transfers.

90.     The Receiver, as receiver of the post-receivership Omnifund, is a creditor of the pre-receivership "zombie" Viator managed by Lauer, on the basis that the Receivership Order gives him the right to institute "actions...against any transfer of monies directly or indirectly traceable from investors in [Viator]," and the pre-receivership "zombie" Viator managed by Lauer made the Viator Transfers that are directly or indirectly traceable from investors in Viator.

91.     The Receiver, as receiver of Omnifund, is a creditor of the Viator Transferees on the basis that the Viator Transferees received monies dissipated by Viator.

92.     The Receiver, as receiver of Omnifund, is a creditor of the Viator Transferees on the basis that the Receivership Order gives him the right to institute "actions...against any

---

[7] *See* n. 1, *supra.*

transfer of monies directly or indirectly traceable from investors in [Viator]," and the Viator Transferees received the Viator Transfers that are directly or indirectly traceable from investors in Viator.

**D.    Orbiter Transfers**

93.    The Receiver brings this action on behalf of each of the Receivership Entities, and on behalf of Partners, to avoid and recover the transfers made by Orbiter listed on Column 4 of **Exhibit "A"** ("Orbiter Transfers") to the Defendant that received the Orbiter Transfers listed on Column 2 of **Exhibit "A"** ("Orbiter Transferees").

94.    The Receiver has standing to bring this action on behalf of each of the Receivership Entities and Partners to avoid and recover the Orbiter Transfers.

95.    In each instance for which the Receiver seeks to avoid and recover the Orbiter Transfers, Orbiter is the "debtor" for purposes of the relevant fraudulent transfer statutes and laws.

96.    In each instance for which the Receiver seeks to avoid and recover the Orbiter Transfers, the Receiver, as receiver of one or all of the Receivership Entities delineated below, or as responsible person for Partners, is the "creditor" for purposes of the relevant fraudulent transfer statutes and laws.

97.    The Receiver, as receiver of each of the Receivership Entities, and as responsible person for Partners, is a creditor of Orbiter on the basis of the Omnifund Proof of Claim.[8]

98.    The Receiver, as receiver of the post-receivership Omnifund, is a creditor of the pre-receivership "zombie" Orbiter managed by Lauer, on the basis that the pre-receivership

---

[8] *See* n. 1, *supra.*

"zombie" Orbiter managed by Lauer dissipated the assets of Orbiter by virtue of the Orbiter Transfers.

99.     The Receiver, as receiver of the post-receivership Omnifund, is a creditor of the pre-receivership "zombie" Orbiter managed by Lauer, on the basis that the Receivership Order gives him the right to institute "actions...against any transfer of monies directly or indirectly traceable from investors in [Orbiter]," and the pre-receivership "zombie" Orbiter managed by Lauer made the Orbiter Transfers that are directly or indirectly traceable from investors in Orbiter.

100.    The Receiver, as receiver of Omnifund, is a creditor of the Orbiter Transferees on the basis that the Orbiter Transferees received monies dissipated by Orbiter.

101.    The Receiver, as receiver of Omnifund, is a creditor of the Orbiter Transferees on the basis that the Receivership Order gives him the right to institute "actions...against any transfer of monies directly or indirectly traceable from investors in [Orbiter]," and the Orbiter Transferees received the Orbiter Transfers that are directly or indirectly traceable from investors in Orbiter.

## V.  JURISDICTION AND VENUE

102.    This Court has original, ancillary and/or supplemental subject matter jurisdiction over all claims at issue in this action pursuant to, *inter alia*, 15 U.S.C. § 78aa, 28 U.S.C. §§ 754, 1331, 1367, and 1692 and the doctrines of pendant and ancillary jurisdiction.

103.    This Court has general personal jurisdiction over each of the Defendants under Florida Statutes § 48.193(2) and the United States Constitution by virtue of the Defendants' substantial, continuous and regular contacts with the United States and Florida.

104.    Alternatively, this Court has specific personal jurisdiction over each of the Defendants under Florida Statutes § 48.193(1)(a) and the United States Constitution by virtue of the Defendants' operating, conducting, engaging in, and/or carrying on a business in Florida. Among other things, the Defendants continuously place marketing materials in Florida's stream of commerce, maintain offices in the Southern District of Florida, maintain an integrated computer system containing client information in the Southern District of Florida, continuously and systematically communicate and coordinate with its offices located in the Southern District of Florida, and direct the Offshore Funds investors to contact the Defendants' offices located in the Southern District of Florida.

105.    This Court has specific personal jurisdiction over each of the Defendants under Florida Statutes § 48.193(1)(b) and the United States Constitution by virtue of the Defendants' participation in the grossly negligent management and breaches of duties committed by Lauer and other insiders of the Offshore Funds, which occurred in the United States and Florida and caused injury in the United States and Florida.

106.    Further, this Court has personal jurisdiction over all of the Defendants under the Florida Long-Arm Statute by virtue of The Citco Group's substantial, continuous and regular contacts with the United States and the Southern District of Florida, which contacts may be imputed to Citco N.V. and CAC because of The Citco Group's exclusive role as Citco N.V.'s and CAC's agent in the United States.

107.    This Court has specific personal jurisdiction over each of the Defendants under Florida Statutes § 48.193(1)(b) and the United States Constitution because of the Defendants' grossly negligent management of the Funds and breaches of duties, which occurred in Florida and caused injury in Florida by virtue of the Defendants' offices located in the Southern District

of Florida and the Defendants' integrated computer system located in the Southern District of Florida, containing the Defendants' client information and the Offshore Funds' erroneous NAV's, which were knowingly disseminated by the Defendants to United States and Florida investors.

108.    This Court has specific personal jurisdiction over the Defendants under NY CPLR § 302(a) because:  (i) the Defendants have transacted business within New York or contracted to supply goods or services in New York; (ii) the Defendants have committed tortious acts in New York; (iii) the Defendants have caused injury to persons or property in New York: (x) while regularly soliciting business or deriving substantial revenue from goods used or consumed or services rendered in New York, or (y) with the reasonable expectation for an act to have consequences in New York and the Defendants' receipt of substantial revenue from interstate or international commerce; or (iv) the Defendant have owned, used or possessed real property situated within New York.

109.    Finally, this Court has personal jurisdiction over each of the Defendants pursuant to the nationwide service of process allowed under 28 U.S.C. §§ 754[9] and 1692 and the Defendants' continuous and systematic contacts with the United States.

110.    Personal jurisdiction is proper over Citco N.V. under Florida Statutes §§ 48.193(1)(a)-(b),(2) and 28 U.S.C. §§ 754 and 1692 based on Citco N.V.'s continuous and systematic contacts with the United States and Florida for the following reasons:  Citco N.V. engaged in a business in Florida; committed tortious activity in the United States and Florida and caused injury in the United States and Florida; issued thousands of erroneous NAV statements to New York-based Lancer personnel, United States investors, and at least one Florida investor;

---

[9] The Receiver has complied with the filing requirements of 28 U.S.C. § 754.

continuously and systematically communicated and coordinated with Citco USA and Citco Technology Management, Inc. located in the Southern District of Florida;  continuously and systematically maintained its computer database containing all of Citco N.V.'s client information, including the value of United States-based securities and the Offshore Funds' bogus valuations in the Southern District of Florida; continuously and systematically collected millions of dollars in wire transfers from United States and Florida investors through a bank account located in New York; continuously and systematically directed the Funds to wire payment to bank accounts in Philadelphia and/or New York; held itself out as an office of The Citco Group; communicated on a systematic and continuous basis with United States and Florida investors as a conduit for information from Lauer and the Offshore Funds; continuously and systematically issued invoices to New York-based Lancer offices; continuously and systematically used a software platform maintained by Citco USA; directed Citco N.V. clients to contact "our Ft. Lauderdale USA office at 954-351-7275;" continuously and systematically reported to Citco USA and Keunen, an officer of Citco USA and a resident of the Southern District of Florida; Keunen's direct participation in the administration of the Offshore Funds and the misconduct at issue while he was in Florida; and collected fees from monies obtained or solicited in the United States, which were inflated based on its own misconduct.

111.    Personal jurisdiction is proper over The Citco Group under Florida Statutes §§ 48.193(1)(a)-(b),(2) and 28 U.S.C. §§ 754 and 1692 based on The Citco Group's continuous and systematic contacts with the United States and Florida for the following reasons:    The Citco Group's Florida subsidiaries conducted business in Florida as The Citco Group's agents; The Citco Group engaged in a business in Florida; committed tortious activity in the United States and Florida and caused injury in the United States and Florida; continuously and systematically

maintained numerous offices throughout the United States, including offices located in Pennsylvania, New York, California, and the Southern District of Florida; continuously and systematically held itself out with its United States and Florida subsidiaries as an integrated corporation; continuously and systematically conducted extensive business administrative and marketing operations within the United States and Florida; continuously and systematically maintained three subsidiaries with their principal places of business located in the Southern District of Florida; continuously and systematically maintained its computer database containing all of The Citco Group's client information and the Offshore Funds' bogus valuations, including the value of United States-based securities in the Southern District of Florida; directed Citco-N.V. clients to contact "our Ft. Lauderdale USA office at 954-351-7275;" continuously and systematically used a software platform maintained by Citco USA; and by virtue of Keunen, a resident of the Southern District of Florida and officer of Citco USA, who also serves as Director of Fund Services for The Citco Group and continuously and systematically directed and controlled various directors who were employed by various Citco entities and served on the Funds' boards while acting in the scope of their employment with Citco as well as the issuance of erroneous NAV's for the Offshore Funds into the United States and Florida; and by Keunen's direct participation in the administration of the Offshore Funds and the misconduct at issue while he was in Florida.

112.    Personal jurisdiction is proper over CAC under Florida Statutes §§ 48.193(1)(a)-(b),(2) and 28 U.S.C. §§ 754 and 1692 for the following reasons:  The Citco Group's and Citco N.V.'s continuous and systematic contacts with the United States and Florida which may be imputed to CAC because of The Citco Group's and Citco N.V.'s role as CAC's agent in the United States; The Citco Group and Citco N.V.'s engaging in a business in Florida and the

United States, which contacts may be imputed to CAC because of The Citco Group's and Citco N.V.'s role as CAC's agent in the United States; because CAC is a mere instrumentality of Citco N.V., which exercises operational control over CAC; and CAC continuously and systematically performed services for the Offshore Funds, which were based out of New York.

113.   Venue is proper in this Court pursuant to 28 U.S.C. §§ 754 and 1692 and pursuant to Article IX of the Court's Case Management Order dated January 8, 2004 in Case No. 03-806120-CIV-ZLOCH.

## VI.  GENERAL ALLEGATIONS

### A.      The Receivership Entities

114.   Lauer is a resident of Connecticut and is a hedge fund manager.  Lauer is the founder, sole manager, and principal owner of the Management Companies and the Funds.

115.   In 1993, Lauer formed a New York limited partnership which he eventually named Lancer Partners, L.P. under the laws of the State of New York.

116.   In November, 1997, Lauer formed Lancer Partners, L.P. ("Lancer Partners" or "Partners") as a limited partnership under the laws of the State of Connecticut and he merged the two partnerships.

117.   Lancer Management II managed Lancer Partners and is its general partner.

118.    Lauer organized Offshore, a BVI international business company, in 1995 as an offshore hedge fund for the purpose of investing in securities.  However, a subsidiary of The Citco Group, Citco BVI, actually prepared and filed the Articles of Association to incorporate the Offshore Funds in the BVI.  From its inception in 1995 until the appointment of the Receiver on July 10, 2003, Offshore had approximately $906,000,000 of investor funds under management.  Offshore was listed on the Irish Stock Exchange from December 24, 1998 through April, 2003.

119.    Lancer Management Group LLC ("Lancer Management") managed Offshore.

120.    Omnifund is a BVI international business company originally incorporated in January 1999 as The Orbiter Fund, Ltd. ("Orbiter").  Citco BVI incorporated both Orbiter and Omnifund.

121.    Omnifund is the successor to the March 2002 merger of Orbiter and The Viator Fund, Ltd. ("Viator"), another BVI international business company incorporated in September, 1999 by Citco BVI.

122.    Lancer Management was also Omnifund's investment manager.

123.    Alpha Omega Group, Inc. is a corporation incorporated under New York law in 1999.

124.    G.H. Associates LLC, is a limited liability company organized under new York law in 1997.

125.    The Offshore Funds were open-ended investment funds, a defining feature of which is the ability of investors to purchase and redeem shares at a net asset value ("NAV") per share.  Unlike ordinary public companies, the share prices of the Offshore Funds did not fluctuate as a function of the supply and demand for their shares.  Rather, the price of a share in

an open-end investment fund is solely a function of the calculated NAV/share of the fund.  The principal factors in the calculation of the NAV/share of a fund are the value of the portfolio of securities held by the fund on the date of the calculation and the number of shares the fund has issued.

126.    The Offshore Funds were not registered with the SEC, were open only to accredited investors with a certain minimum net worth, had limited redemption windows, and provided limited information concerning both the identity of the securities in the investment portfolio and the funds' investment strategies.  Investors were solicited all over the world, including in Florida, to invest in the Offshore Funds primarily through sales agents using a private placement memoranda ("PPM") and other marketing materials.  For these very reasons, the Offshore Funds and their investors relied heavily on the NAV's prepared by Citco N.V. and by Keunen, who was acting within his express authority as a director of The Citco Group, as well as the business acumen, industry reputation, and other oversight services the Defendants represented they would provide.

**B.    Lauer's Conduct**

127.    At all times relevant to this Third Amended Complaint, Lauer inflated the stated NAV's of the Funds' portfolio holdings by engaging in manipulative trading of certain of the portfolio holdings on the public markets and by assigning bogus valuations to certain of the portfolio holdings not traded on the public markets.

128.    These inflated NAV's in turn inflated the fees payable to Lauer and Citco, induced new investors to deposit additional funds into the Offshore Funds, and induced existing investors to maintain their investments in the Offshore Funds.

129.   Lauer, through the Management Companies, depleted the Funds by investing millions of dollars constituting significant portions of the Funds' total portfolios in a small number of companies whose shares were not listed on any major exchange and were instead traded infrequently on the over-the-counter markets.  Lauer would use the Offshore Funds' assets to acquire large and often controlling stakes in these companies by purchasing securities with various restrictions on their trading through private transactions, even though most of the companies had no earnings or even reasonable prospects for significant earnings.  After obtaining these restricted shares and in order to create "high" NAV's for the Offshore Funds at the end of the Offshore Funds' respective reporting periods, Lauer would typically purchase a small number of unrestricted shares in these companies, in the over-the-counter bulletin board market, for no apparent legitimate business purpose at a price much higher than either the original acquisition or historic price.  Rather than scrutinizing or questioning these transactions, the Defendants instead valued all of the restricted and unrestricted shares owned by the Offshore Funds at the higher price manufactured by Lauer's manipulative trading – all without determining if using this valuation method provided the fair value for these securities.

130.   Because of the inflated NAV's, Lauer depleted the Offshore Funds further by extracting huge management and incentive fees – fees that were determined based on the overstated NAV's for the Offshore Funds that Lauer had created.  The Defendants also benefited from this inflation, as their fees were directly tied to NAV's of the Offshore Funds.

131.   At all times relevant to this Third Amended Complaint, Lauer lost money on many of the investments he chose for the Offshore Funds.

132.     At all times relevant to this Third Amended Complaint, the Offshore Funds continued to honor redemption requests submitted by investors seeking to cash out the "profits" apparent from the artificially inflated NAV's of the Offshore Funds' holdings.

C.      **Citco's Conduct**

133.     Citco N.V. had Administrative Agreements with the Offshore Funds (the "Citco Agreements") from 1996 through its resignation in 2002.  In relevant part, the Citco Agreements required Citco N.V. to prepare and maintain all financial and accounting books and records of the Offshore Funds, compute monthly NAV's, independently price the Offshore Funds, hire all such attorneys, auditors, and other service providers as were necessary, and provide directors to each of the Offshore Funds.

134.     In return, the Citco Defendants received administrative fees from the Offshore Funds based on the NAV's for each Offshore Fund as well as a monthly fee for the directors provided to each of the Offshore Funds.

135.     Because the administrative fees were tied to the NAV's, the Citco Defendants had an incentive to establish, conspire with Lauer, and/or turn a blind eye toward Lauer's inflation of the NAV's.

136.     In connection with providing directors to each of the Offshore Funds, Citco N.V. and The Citco Group placed their own employees and directors on the board of directors of the Offshore Funds.

137.     Specifically, Citco N.V. selected Quilligan, its General Manager and Managing Director, to serve as a director of Offshore from 2001 until early 2002.  At all times while serving as a director of Offshore, Quilligan acted within his express authority and in the scope of his employment as an employee of Citco N.V.  Quilligan was involved intimately with the day-

to-day operations at Citco N.V. related to Lancer.  Through his role as director and employment with Citco N.V., Quilligan took orders from The Citco Group related to Citco's integrated administration of the Offshore Funds.  Through his role as a director of Offshore and with Citco N.V., Quilligan regularly did business in New York to meet with Lancer personnel regarding various fund issues, including valuation.  The Offshore Funds did not pay Quilligan for his services on Offshore's board.  Instead, they made payments to either CAC or Citco N.V.  The payments were for the benefit of Citco N.V. and/or The Citco Group.

138.    The Citco Group selected Stocks, its Director of the International Fund Services division, to serve as a director of Offshore from 1995 until July 2001.   At all times while serving as a director of Offshore, Stocks acted within his express authority and in the scope of his employment as an employee of The Citco Group.  The Offshore Funds did not pay Stocks for his services on Offshore's board.  Instead, they made payments to either CAC or Citco N.V.  The payments were for the benefit of Citco N.V. and/or The Citco Group.

139.    Citco N.V. selected Conroy, its Managing Director, to serve as a director of Offshore from 1998 until early 2002.  (Collectively, Quilligan, Stocks and Conroy will be referred to herein as the "Citco Directors").  At all times while serving as a director of Offshore, Conroy acted within his express authority and in the scope of his employment as an employee of Citco N.V.    The Offshore Funds did not pay Conroy for his services on Offshore's board. Instead, they made payments to either CAC or Citco N.V.  The payments were for the benefit of Citco N.V. and/or The Citco Group.

140.    Citco  N.V.  and  the  Citco  Directors  continuously  and  systematically communicated with the United States and Florida investors regarding subscriptions, redemptions, and valuations of the Offshore Funds.

141.    Citco N.V. and the Citco Directors owed a duty to use reasonable skill and care in performing services for the Offshore Funds, including one or more of the following:  the duty to use reasonable skill and care in advising the Offshore Funds on the appropriate course of action; the duty to use reasonable skill and care in providing the Offshore Funds with true and correct information; the duty to use reasonable skill and care in valuing the NAV's in accordance with GAAP; the duty to use reasonable skill and care to independently price the Offshore Funds; the duty to use reasonable skill and care to independently verify the valuations stated by Lauer; the duty to use reasonable skill and care to discover the incorrect valuations and NAV calculations reported by Lauer; the duty to use reasonable skill and care to report the incorrect valuations and NAV calculations reported by Lauer to the Offshore Funds' directors, investors, or appropriate authorities; and the duty to identify and act on conflicts of interest and the "red flags" set forth below.

142.    Citco N.V. and the Citco Directors knowingly disregarded and ignored numerous "red flags" in the valuation process of the Offshore Funds. The facts known to them regarding all the Offshore Funds, beginning at least back to 1999, and possibly even earlier, and extending until their resignation in 2002, should have alarmed them into action.  Numerous "red flags" that were known to them would have put a reasonably prudent fund administrator or director on notice that Lauer was engaged in conduct to the extreme detriment of the Offshore Funds.  These glaring "red flags" would have prompted a reasonably prudent fund administrator or director to investigate and disclose the inflated values of the securities held by the Offshore Funds to the investors, the Independent Directors, the Offshore Funds' auditors, and/or the appropriate authorities.  By simply complying with their professional responsibilities, duties of care, and fiduciary duties, Citco N.V. and the Citco Directors could have ceased the diminution of the

Offshore Funds' value.  Instead of conducting themselves as required by the legal, professional, and contractual obligations to the Funds, they knowingly, willfully, recklessly, and/or with gross negligence took advantage of Lauer's misconduct.

**Red Flag #1 – There Was a Substantial Increase in the Offshore Funds' Value at a Time When Global Equity Markets Were Performing Poorly.**

143.    Lauer's claims of rapidly increasing NAV's in a declining equity market should have received professional skepticism on the part of the Defendants, but did not.  At the conclusion of 1999, the global equity markets declined significantly and investors generally suffered negative returns for 2000 and 2001.  In 2000, major equity indices either lost significant value or grew little – S&P 500 (-10.14%), DJIA (+5.11%), NASDAQ 100 (-39.3%).  In 2001, major equity indices lost value – S&P 500 (-13.04%), DJIA (-11.07%), NASDAQ 100 (-21.05%).  Yet, the Offshore Funds purportedly grew exponentially during both 2000 and 2001.  From December 31, 1999 to December 31, 2001, Offshore purportedly gained 37.9%.  From December 31, 1999 to December 31, 2001, Orbiter purportedly gained 10.3%.  From December 31, 1999 to December 31, 2001, Viator gained an astounding 105.8%.  These dramatic gains, in the face of at best a stagnant or declining market should have caused the Defendants to scrutinize the sources of the gains and reevaluate how the NAV's were calculated for the Offshore Funds.

**Red Flag #2 – There Was a Substantial Increase in the Concentration of the Offshore Funds' Holdings in the Target Companies.**

144.    Over the same time period that the Offshore Funds' purported performance was strikingly better than the performance of the global equity markets, there was a growing concentration of the Offshore Funds' total portfolio attributed to increasingly fewer, thinly traded stocks, including Biometrics Security Technology, Inc. ("Biometrics") (formerly known as AUG Corp.), Fidelity First Financial Corp. ("Fidelity First"), SMX Corp. ("SMX"), XtraCard Corp.

("XtraCard") (formerly known as Nu-D-Zine, Inc., hereinafter as "Nu-D-Zine"), Method Products Corp. ("MPC"), Total Film Group, Inc. ("Total Film"), World Wireless Communications ("World Wireless"), Equitel, Inc. ("Equitel") and Continental Southern Resources, Inc. ("CSR") (collectively, the "Target Companies").

145.    Specifically, there was a dramatic increase in the Target Companies as a percentage of the Offshore Funds' holdings.  For the year ended December 31, 1998, the Target Companies accounted for only 5.9% of the Offshore Funds' portfolio value of $325,600,000.[10] By December 31, 2000, the Target Companies accounted for 53.4% of the Offshore Funds' portfolio value of $768,200,000.  This concentration continued to grow, so that by December 31, 2002, the Target Companies accounted for 83.2% of the Offshore Funds' portfolio value of $878,400,000.  Moreover, the majority of the Target Companies were companies that did not make filings with the SEC and for which there was no publicly available financial information and had questionable or deteriorating financial conditions.  A minimum of due diligence would have disclosed Lauer's huge investments in failing companies and the unsupported increases in these failing companies' stock valuations.  This dramatic increase in the concentration of the Offshore Funds in the Target Companies should have presented a red flag sufficient enough to increase the Defendants' scrutiny of them.  Even assuming the Defendants recognized these tell tale aberrations that signified a valuation problem had permeated the Offshore Funds, rather than notifying investors, Independent Directors, the Offshore Funds' auditors, and/or appropriate authorities of this increasing "proportion that big bets represent to the overall portfolio," as

---

[10] The pre-receivership values stated for portfolio companies in this Third Amended Complaint do not reflect actual values but the values stated by Lauer and approved by the Defendants, unless otherwise noted.  These values reflect Lauer's manipulative trading and valuation strategies.  The Receiver does not endorse these numbers as true valuations for these holdings; rather, these manipulated valuations are so detached from reality as to give the Defendants obvious proof of Lauer's manipulations.

Keunen, the Director of Fund Services for The Citco Group, stated fund administrators should do, the Defendants said and did nothing.

**Red Flag #3 – There Was a Substantial Increase in the Values Attributed to the Offshore Funds' Holdings in the Target Companies**

146.    At the same time there was a substantial increase of the Target Companies as a percentage of the Offshore Funds' holdings, there was also a dramatic increase in the values attributed to them.  For the year ended December 31, 1998, the Target Companies accounted for only $19,300,000 of the Offshore Funds' portfolio value.  By December 31, 2000, the Target Companies accounted for $342,400,000 of the Offshore Funds' portfolio value – a fourteen-fold increase.  By December 31, 2002, the Target Companies accounted for $730,700,000 of the Offshore Funds' portfolio value.  This dramatic increase in the value of a small number of holdings should have caused the Defendants to scrutinize the valuations placed on the Offshore Funds' holdings in the Target Companies and take appropriate steps to ensure that the "big bet" positions were carried at fair value in accordance with GAAP.  Moreover, a minimum of due diligence would have exposed these baseless valuations.

**Red Flag #4 – There Was a Dramatic Increase in the Values Given to Large Blocks of Restricted Stocks That Had Been Purchased for Much Lower Prices.**

147.    Between 1998 and 2002, the bulk of the Offshore Fund's investments in the Target Companies were purchased for pennies per share in private, off-market transactions for restricted stock.  These restricted securities were then written up by tens of millions (or even hundreds of millions) of dollars just days or months later based primarily on the price for comparatively tiny purchases of unrestricted shares of the same stock by the Offshore Funds that they acquired through the public markets.  The holdings were then reflected in the financial statements as having millions of dollars of "unrealized gains."  These dramatic jumps in

purported value of restricted shares should have caused the Defendants to scrutinize the valuations of the securities.  Only when the Defendants were looking for a way to disassociate themselves from the Offshore Funds did they ask for an explanation of this issue from Lauer and Lancer.

**Red Flag #5 – There Were Small, End of Period Trades in the Stock of the Target Companies Serving No Business Purpose Other than to Inflate the Offshore Funds' NAV's.**

148.    The Funds' tiny purchases of unrestricted shares in the Target Companies at high prices that were used to value the enormous holdings of restricted securities served no apparent business purpose other than to inflate the Offshore Funds' NAV's.  When the Offshore Funds already held hundreds of thousands or even millions of shares in the Target Companies – and often had controlling interests – there was no business purpose served in purchasing a comparatively miniscule number of publicly traded shares at the end of a month, quarter or fiscal year at relatively high prices.  These tiny, end-of-period trades should have caused the Defendants to scrutinize the valuations of the securities in which these trades were taking place. Only when the Defendants were looking for a way to disassociate themselves from the Offshore Funds did they request an explanation of this issue from Lauer and Lancer.

**Red Flag #6 – The End of Period Trades, and the Corresponding Increases in Valuation of the Target Companies, Coincided with the Calculation of Lauer's Fees.**

149.    Not only was there no valid business purpose for the small, end-of-period trades, but the timing of the trades suspiciously coincided with the timing of the calculation of management and incentive fees paid to the Management Companies and thereafter to Lauer.  The management and incentive fees paid to the Management Companies and to Lauer were calculated based on the NAV of the Offshore Funds at the end of certain quarters or the fiscal year.  It was thus in Lauer's interest to cause the NAV of the Offshore Funds to appear to be high

at the points in time when these fees were calculated; the small, end-of-period trades in the Target Companies served this interest – a fact that should have been obvious to the Defendants, especially since their *own* fees were calculated at the same time and on a similar basis.

**Red Flag #7 – There Was a Substantial Increase in the Number of Shares Obtained by the Offshore Funds at Little or Even No Cost.**

150.    A substantial percentage of the shares in the Target Companies obtained by the Offshore Funds were acquired for little or no cost through the exercise of warrants, options or debt conversions.  These very same securities were then valued at extraordinary amounts, despite their nominal cost basis.  For example, in 2001, Lauer converted approximately $500,000 in defaulted loans to Fidelity First into common stock in Fidelity First.  This conversion was done at a ratio of one share of stock for each penny of debt (plus accrued interest), resulting in the issuance of 56,656,629 shares.  Lauer then simultaneously valued these shares at $2 per share, resulting in the conversion of approximately $500,000 in worthless debt into equity with a purported value of approximately $113,000,000.  This and other dramatic increases in value for securities obtained at little or no cost should have caused the Defendants to scrutinize the valuations for those holdings.  Only when the Defendants attempted to disassociate themselves from the Offshore Funds did they ask for an explanation of this issue from Lauer and Lancer.

**Red Flag #8 – The Defendants Knowingly Accepted and Approved Lauer's Absurd Valuations.**

151.    During all relevant time periods, there was no readily ascertainable market price to determine the value of the majority of the Target Companies.  For these securities, the Defendants knew that the valuations claimed by Lauer were absurd.  Lauer used trades at the ends of months, quarters, and years in determining their purported values.  The values claimed for these securities thus jumped from only a few million dollars to a figure approaching one

billion dollars in only two years. The Defendants knowingly, willfully, recklessly, and/or with gross negligence accepted the investment manager's baseless opinion for valuing thinly traded and restricted securities. This dramatic increase should have caused the Defendants to scrutinize the valuations of the Offshore Funds' holdings. Instead, the Defendants relied on Lauer's absurd valuations and recklessly failed to verify them, when the Defendants knew that Lauer's fees, like theirs, increased with the value of the absurd valuations.

152. The Defendants and the Offshore Funds had a close relationship due to Citco's administration of the Offshore Funds. As noted, based on the Citco Agreements, The Citco Group and Citco N.V. placed their own directors and employees on the boards of the Offshore Funds in exchange for a fee.

153. In September 2001, one such director, Quilligan observed that Lancer's valuations were absurd. In an e-mail that Quilligan sent to Conroy, Quilligan admitted to his fellow director that the Lancer portfolio valuation had no basis in reality:

From:        Quilligan, Declan  CUR
Sent:        Friday, September 21, 2001 5:20 AM
To:          Conroy, Kieran  DUB
Subject:     FW: Lancer NAV

I took a detailed look at the pf following notification by Serge of what valuation Lancer wanted to put on a prfd stock just recently bought. As far as I am concerned 75% of the portfolio is very illiquid with absurd valuations relative to the cost which is on average a fraction of the market value. Warrants are grossly overvalued and have been since start of year as the broker statement prices for wts have merely been accepted. Lancer accept this and agreed to write down such wts before end of year. PWC signed off on the latest financial statements to be released tomorrow but I am quite concerned. It appears to me that they have put absurd valuations on illiquid stocks since the start of the year in particular in order to compensate for serious losses from some of their P/E or reg D deals.

154. In later conversations among themselves, the Defendants knew that these investments could not sustain the valuations placed on the various stock holdings, yet all failed to report these problems to anyone outside the Citco organization and also failed to take any action

based on the "red flags," conflicts, and absurd valuations.  For example, discussions in February

2002 recognized that the valuation placed on Total Film by the Offshore Funds was unrealistic at

best.  Ger-Jan Meyer, an internal auditor for Citco, wrote an e-mail to Quilligan on February 4,

2002, identifying this issue:

```
From:         Meyer, Ger-Jan  CUR
Sent:         Monday, February 4, 2002, 5:30 PM
To:           Quilligan, Declan  CUR
Subject:      Lancer
Importance:   High
```
Bram Gedopt came to me and told me that he does not feel comfortable with the valuation with
the Total Film Group.  He has background information that the company has serious trouble, but
Lancer is still showing a very high unrealized gain (cost USD8 mio market 35 mio)  He has to
issue the January 31, 2002 financials in this week.  I think there is a serious risk that PWC want
to adjust the valuation per December 31, 2001.
I understood that you are away until February 12.  Do you want that I contact Gino Nivilac to get
a solution here?
Rgrds,
Ger Jan

     155.   Shortly thereafter and on February 6, 2002, Quilligan and Edward Heidema of

Citco N.V. traveled to New York to meet with Lancer personnel, including Lauer, Bruce Cowen

("Cowen"), Martin Garvey, and David Newman.  Quilligan sent the following recap via e-mail

of this meeting reporting to Keunen, a director of The Citco Group in Miami and Conroy in

Dublin:

```
From:      Quilligan, Declan  CUR
Sent:      Wednesday, February 06, 2002 11:52 PM
To:        Keunen, William  MIA; Heidema, Edward  CUR
Cc:        Fenlon, Greg  CUR; Conroy, Kieran  DUB
Subject:   RE: Lancer problems
```

William,
The meeting with Lancer this afternoon was unpleasant.  Michael Lauer, Bruce Cowen, Marty
Garvey and Dave Newman all attended and Edward was with me.  They think their valuations of
the portfolio is reasonable and are very much of the view that the market priced all the dot.coms
[sic] and the Yahoo's etc of this world because of perception and nobody raised valuation issues
for Funds that held these.  We got off to a bad start when it turned out that an investigation into
Fidelity First Financial Corp actually had no relevance to Lancer as the company they are

invested in is First Fidelity Financial Corp which they say is a totally unrelated company.  We stressed the risk awareness approach we are taking and that the Fund had been identified as one requiring extra scrutiny.  They want time to put what we have asked for together and do not feel that the NAV should be delayed pending them acculating [sic] this information.  They invited us to meet representatives from all these companies and if we wished to attend some of their meetings etc.  Did any of this make me feel more comfortable, not really.  Although they take haircuts on two positions they are hugely aggressive in valuing thinly traded stocks and  Note they did say that all their investors know exactly what they are doing, that they speak to them regularly etc.  They said they had replacement directors in line, one of which is an investor in the Fund and the other who is well known in the financial world (Eddie can you remember the name).  Also Michael mentioned that if we were concerned that hey we could just walk away if we wished and Marty made a point of bringing up any mistake that we ever made.  At this stage although there is subscription activity of $14m should we give them that time frame to collate everything we need and then on the basis of that make an informed decision of what we want to do.  Note the below is a brief description of some of the large positions in the portfolio which I got sent to me from Curacao.  Eddie can you add anything to the above? Is the next email that I will send in a minute a suitable one to send to Michael Lauer or should we add more or make it sound better.  I am travelling [sic] for four hours between 8 and 12 tomorrow morn but will be in touch soon thereafter.  Kieran do you have anything to add.  PWC are also concerned.

Rgds
Declan


AUG Corp.

AUGC suspended ongoing operations in 1/1/1999 and is currently seeking buyers or strategic partners for further development of its existing technology, as well as merger opportunities.  For the 9 months ended 09/30/01, the company reports no revenue.  Net loss before extraordinary item fell 69% to $48,000.  Results reflect the suspension of revenue generating activities.  Lower loss reflects the absence of $90,000 in interest expenses and $108,000 in other income.

NU-D-ZINE

No ready information available on this one, which is a concern in itself I would say.

SMX Corp – valued at over $130m

Issue: April 23, 2001

LAKE MARY, Fla., April 23 /PRNewswire Interactive News Release/ -- FARO Technologies Inc. (Nasdaq: FARO), a leading provider of computer-aided manufacturing measurement (CAM2) solutions, today announced that it has entered into an agreement with SMX Corp. of Kennett Square, PA to provide SMX up to $3.0 million in new financing.  As part of this financing arrangement, FARO and SMX have executed a letter of intent for an option to acquire SMX.

SMX Corp. is a leading manufacturer and worldwide supplier of laser tracers and targets as well as metrology software and contract inspection services.  Laser trackers are highly accurate, portable, coordinate measurement machines used to make three-dimensional measurements of tooling, fixtures, large parts and other large objects in a wide variety of industrial, scientific and commercial applications.

"Our financing and intended option to acquire SMX provides FARO an excellent opportunity to expand our product line with a complementary measurement technology to better serve our worldwide customer base," said Simon Raab, FARO's President and CEO.

Total Film Group

As part of the ongoing effort to restructure Total Film Group (the "Company") to profitability in the future, the Company reduced its workforce by approximately 75% at its Beverly Hills headquarters.  The announced layoffs were due to the underperformance of the Company's two most recent motion pictures released through Paramount Classics: My First Mr. and Bride of the Wind.

The Company, which has incurred ongoing losses from operations recently divested itself of all non-core business segments.

Current market conditions have and are significantly affecting the Company's operating results and liquidity.  In the near future, the Company will be forced to make difficult decisions regarding its plan of operation and capital structure.  Currently, there is no assurance that the Company will be able to continue to fund its operations through the sale of equity or by issuance of debt instruments.

156.   This demonstrates that the Defendants knew how to obtain information about the companies held in the Funds' portfolio, and that the information was readily available to them at all times to independently value the Funds' NAV and to confirm Lauer's valuations.   The Defendants knowingly, willfully, recklessly and/or with gross negligence breached their duties of care to the Offshore Funds by ignoring this information and/or failing to obtain it.  Further, the Defendants actively participated in Lauer's scheme by knowingly, willfully, recklessly, and/or with gross negligence disseminating false NAV's to the Offshore Funds and to the investors.

157.   Moreover, the Defendants never verified Lauer's claim that "the investors know exactly what they are doing" in relation to the Offshore Funds' holdings in the Target Companies.  Even more troubling, the Defendants did not even know the name of one of the companies in the Offshore Funds' portfolio-demonstrating their failure to perform even a minimal level of due diligence or independent valuation.

158.   Despite having actual knowledge of the Offshore Funds' inflated NAV's, on February 7, 2002, Keunen, while acting within his express authority and within the scope of his employment as the Director of Fund Services of The Citco Group, responded to Quilligan's e-mail by directing Citco N.V. to, "send out the NAV for Jan."

159.    As demonstrated by the above email excerpts, The Citco Group disregarded corporate formalities, and Citco N.V. served as its alter ego.  In the alternative, Citco N.V. served as The Citco Group's agent via Keunen's control over Citco N.V. and acknowledgements and representations to the Offshore Funds.  The Citco Group and Citco N.V. could have easily obtained independent information to verify the true value of the portfolio companies throughout their administration of the Offshore Funds as demonstrated by the information that they cite in their own internal emails.

160.    It was not until March, 2002, however, that the Defendants apparently decided that the valuation problems would result in their liability.  At that point, they finally decided to consult Lauer, as reflected by an e-mail exchange between Quilligan, Lauer and Cowen, a Lancer insider, in March and April 2002.  This exchange demonstrates that (a) the Defendant's internal audit and compliance department required detailed backup valuations, (b) the Defendants always knew what information to request to "properly evaluate" the Funds' valuations, (c) independent and fair valuation methods are "part of Citco's policies and procedures," (d) the Defendants recognized and admitted their obligation to compute and independently value the NAV, (e) the Defendants finally attempt to gain "comfort" about Lauer's valuation methodology, which they had internally discredited all along, and (f) the Defendants finally "woke up" because of pending disaster and their potential liability - prior to this point, they gladly accepted their inflated administration fees based on Lauer's manipulated and inflated valuations.  Further, the emails reflect that The Citco Group disregarded Citco N.V.'s corporate formalities and controlled Citco N.V.'s administration of the Funds, and that the Defendants understood but breached their duties toward the Offshore Funds by actively concealing the risks that the Offshore Funds and their investors were exposed to:

From:  Quilligan, Declan  CUR [Dquilligan@citco.com]
Sent:   Wednesday, March 27, 2002 9:55 PM
To:      Bcowen@thelancergroup.com; Michael Lauer
Subject: RE: Memo Valuation Dec 31, 2001 and 2002
Bruce, Michael,
If you cannot get us the full detail re backup to the portfolio valuations that you already committed to give to us by March 31 please let me know what you can provide.  We committed to our internal audit and compliance dept on the basis of your commitment to me to have detailed back up to valuation issues by this month end.  Senior management of Citco are aware of the valuation issues and are keenly awaiting the data you promised.  What can we get prior to March 31?
Pls let me know so we can move forward
Thanks
Declan
*          *          *
From:  Quilligan, Declan CUR [mailto: DQuilligan@citco.com]
Sent:   Monday, April 08, 2002  10:53 PM
To:      bcowen@thelancergroup.com
Cc:      mlauer@thelancergroup.com
Subject:  Our discussion today

Bruce,
Just to confirm our discussion today.  Citco needs to receive the full documentation, financial analyses, future plans etc that will justify the valuations that Lancer Management consistently say are fair and reasonable for the major positions in the portfolio.  We were to receive such by March 31 but you have stated that due to a number of circumstances you were unable to collate the material in that timeframe.  In order to properly evaluate such material prior to the next month end Citco requires such documentation by Tuesday April 23.  If Citco has not received the requested documentation at that juncture Citco will have to consider its position carefully in the context of our internal risk management policies and other considerations.
Best regards,

Declan

*          *          *

From:  Bruce Cowen [mailto:bcowen@thelancergroup.com]
Sent:   Tuesday, April 09, 2002  8:30 AM
To:      Quilligan, Declan CUR
Subject:        RE:  Our discussion today

*          *          *

Our first requirement is to continue to manage the Fund to ensure that we are performing our fiduciary responsibility to our investors, which we will continue to do.  Secondly, we are preparing the necessary information for the audit and have engaged a firm to perform valuation

services on certain positions as we feel this will be most beneficial to PriceWaterhouseCoopers in rendering an opinion on our financial statements.

\*      \*      \*

In the meantime, I will prepare a memorandum, in some detail, on our major positions and present it to you by your deadline of April 23rd.

\*      \*      \*

From:  Quilligan, Declan  CUR [DQuilligan@citco.com]
Sent:   Thursday, April 11, 2002 4:55 PM
To:      Bruce Cowen; mlauer@thelancergroup.com
Subject:        RE:  Our discussion today

Bruce, Michael,
Let me again reiterate that we are looking for comfort as regards valuation issues in the context of a risk management approach that is part of Citco's policies and procedures.  We had an understanding that we would get information from Lancer Management by March 31 and not receiving that did cause us some difficulty.  You are correct as regards what you say as regards small staff etc and I fully understand that point and the fact that you have a fiduciary responsibility to shareholders.  You are also correct in saying that Citco and Lancer have always had a very good relationship and I very much hope that any tension that may have arisen over our requests for backup documentation will dissipate once we receive and are comfortable with the documentation provided.
I regard the fact that you have engaged a valuation firm to perform valuation services as extremely positive and I much look forward to receiving the detailed memorandum on or before April 23 which will give us the time we need to go through it before month end.
Please see attached the administration agreement.  As part of computing the NAV we need to gain comfort about the valuation of the portfolio.  With 6 thinly traded securities making up a very significant portion of the portfolio and net assets we feel it is appropriate to gain as much comfort as we can about these positions and on a regular basis and not just at audit time.  You and Lancer Management do have an integral role in providing that comfort required to ourselves and of course PWC.
Thank you and best regards.
Declan

161.    By the time Quilligan demanded this information, however, the Defendants'

internal discussions focused on finding a way to extricate themselves from association with the

Offshore Funds.  By this point, the Defendants' last hope was that the Offshore Funds' auditor

would approve the Offshore Funds' financial statements. The Defendants believed that the best

method for avoiding liability was the auditors' approval of the financial statements.  In other

words, if the auditors signed off on Lauer's financial statements, the Defendants apparently

believed that this would relieve them from liability.

162.    Nevertheless, Citco personnel internally admitted that the Defendants' own management of the Offshore Funds was an utter failure and that they had breached their duties of care, fiduciary duties, and obligations to the Offshore Funds.   Internal auditor Ger-Jan Meyer prepared a valuation memorandum for wide dissemination inside the Defendants regarding problems in Offshore's portfolio.   In relevant part, this memorandum states:

To:     Declan Quilligan
        Greg Fenlon
        Claudio Cecchini
        Bram Gedopt

From:  Ger Jan Meijer

C.c.:   William Keunen
        Dennis Dambruck
        Edward Heidema
        Jos Leppers
        Albert van Nijen

Date:   May 13, 2002

Subject:        Valuation of the portfolio of Lancer Offshore Inc.

1.      Introduction

CFS has concern about the possible aggressive valuation of the portfolio of Lancer Offshore Inc. and has requested the investment manager for additional background information about the valuation.  We received this background information on May 8 and performed a review on it. Our findings are summarized in this memo.
*       *       *

3.      Conclusions
*       *       *
3.2     Bloomberg
Most of the investments have a quotation in Bloomberg.  These are obtained from the Bloomberg OTC Bulletin Board.  It is doubtful if we can rely on these prices, because they look easy to manipulate by interested parties.
There are serious indications that Lancer is/was manipulating the prices for:

AUG Corp;

Method Prod;
Fidelity First Financial
World Wireless

Manipulation of market prices might be seen as a criminal action.  We have jurisprudence about the Rockies funds (much smaller fund) where the directors had to pay a fine for manipulating the market price.

\*          \*          \*

4.        Aug Corp.

\*          \*          \*

4.2        Comments on the Lancer valuation

In my opinion the valuation by Lancer is too aggressive and not based on the prudent concept:

- According to Bloomberg the trade volume is 0 to 5,000 share per week.  Several weeks have no even [sic] any trading activity at all.  It is doubtful that this market is a sound basis [for] determining valuation of a position of 18,000,000 shares;

- There is a risk that Lancer has influence/control over the market prices by Bloomberg.  There are even serious indications that Lancer is manipulating the market price.;

- The market price of AUG is subject to high volatility and that could be an indication that the market price is not a sound source for valuation: (Nov 28, 2001: 6.00 / Dec 31, 2001: 3.50 / Jan 31, 2002: 5.00 / Feb 28, 2002: 5.00).

\*          \*          \*

- It is my experience that most other investment managers would value this position for not more than cost.

5.        Manhattan Scientifics Inc.

\*          \*          \*

5.2        Comments on Lancer Valuation

- According to Bloomberg the total number of shares is 120,900,000 per May 12, 2002;

- Total equity per March 31, 2002 is USD 1,240,000 (unaudited financials).  Intrensic [sic] value per share is thus more or less USD 0.01.  Market price is 20 to 30 times the intrinsic value;

\*          \*          \*

5.3        Conclusion

It is my experience that a haircut of such huge positions (compared to the market volumes) should be taken.  Also there will be dilution of the value per share when the warrants would be issued.  I propose a haircut of 20% on the total market value of shares and warrants – 20% x (8,001,455 + 3,200,000) = 2,240,291

6.        Method Prods Corp New common shares and warrants

\*          \*          \*

6.2        Comments on Lancer valuation

Shares

- According to Bloomberg low quantities are traded.  Several weeks have no even [sic] any trading activity at all.  It is doubtful that this market is a sound basis [for] determining valuation of a position of 2,451,059 shares;

- There is a risk that Lancer has influence/control over the market prices by Bloomberg.  There are even serious indications that Lancer is manipulating the market price.  By the end of March the only trades were 500 shares for 5.00 on March 27 and 500 for 5.85 shares [sic] on March 28. Lancer was purchasing these quantities.  Also for other months Lancer is always purchasing just before month end;

- The market price of Method Prod is subject to high volatility and that could be an indication that the market price is not a sound source for valuation: (April 25, 2002: 3.25 / April 30, 2002: 6.05)

\*        \*        \*


- It is my experience that most other investment managers would value this position for not more than cost.

7.        Nu-D-Zine Bedding and Bath Inc

Pending: waiting for background information.  No information found in Bloomberg.

8.        SMX

\*        \*        \*


8.2        Comments on Lancer valuation

- The trade volume according to Bloomberg is very thin if compared with the holdings by the fund;

- It is normal practice to take a haircut on the market price when having such huge positions;

- There is a risk that Lancer has influence/control over the market prices by Bloomberg;

- The market price is subject to high volatility and that could be an indication that the market price is not a sound source for valuation.

\*        \*        \*


9.        World Wireless Communication

\*        \*        \*


9.2        Comments on Lancer valuation

- The trade volume according to Bloomberg is thin if compared with the holdings by the fund;

- It is normal practice to take a haircut (15-20%) on the market price when having such huge positions;

- There is a risk that Lancer has influence/control over the market prices by Bloomberg.  Why is Lancer purchasing little quantities while they obtain large quantities of shares with the private placements . . .?

- Please note that Lancer Partners LP and Orbiter Fund LP have also positions.
*       *       *

10.     Fidelity First Financial

*       *       *

10.2    Comments on valuation by Lancer

There are almost not [sic] quantities traded on the market and probably the only trades are made by the Lancer group.  Such trades are always made just before month end.  It is my opinion the Bloomberg prices is [sic] not good basis for valuation and there are even serious indications that Lancer is manipulating the market prices.
Emphasis in original.

163.    Only after it had become clear that they had to extricate themselves from liability to the Offshore Funds did the Defendants undertake a close analysis of the Funds' portfolio holdings.   However, the Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their duties of care to the Offshore Funds by failing to fulfill these duties from the date Citco first began administering the Offshore Funds.   The Defendants further breached their duties to the Funds by failing to disclose this information to the appropriate authorities, investors, and independent directors and by actively participating in Lauer's scheme by disseminating false inflated NAV's to the investors and the Funds.

164.    Ger-Jan Meyer's memo was sent to Keunen for his review and comment.   In response, Keunen, acting within his express authority and in the scope of his employment for The Citco Group, responded by forwarding the memo to all Citco Executive Directors on May 22, 2002, addressing his comments to Christopher Smeets ("Smeets"), the president and CEO of The Citco Group:

From:       Keunen, William  MIA
Sent:       Wednesday, May 22, 2002, 7:48 PM
To:         zz*Citco All Executive Directors
Cc:         Quilligan, Declan  CUR; Verhooren, John  GEN;
Conroy, Kieran  DUB; Peller, Jay  NYC

Subject:        Lancer

Chris, as I mentioned to you yesterday, here is the story about Lancer, a fund that has been administered out of Curacao since its inception in 1995.

Recently the management team in Curacao have become concerned about the pricing policy of the Fund, in particular with respect to its less liquid positions which at their current reported value make up two thirds of the value of the portfolio.  We began by discussing our concerns with the Investment Manager and then asked for back-up in the form of reports about the relevant companies.  To date two of seven reports have been received and they do not make for pleasant reading.  Then we had our internal audit group perform a detailed analysis of the positions.  Their report is enclosed.  The upshot is that there are a handful of positions which we feel the IM has at the least grossly over-valued and at worst manipulated the month end valuations by executing large buys close to month end that force the price up.  The whole situation was discussed during my visit to Curacao.

Other issues to be taken into consideration:

·        The pricing policy of the Fund as stated in the Prospectus is clear – value positions at latest closing price – the Fund follows this policy and a strict interpretation of such indicates that it is not breaking its rules.

·        Our personal directors (Kieran and Declan) resigned earlier this year.

·        The Fund's auditors, PwC Curacao have signed each year's audit report up to 2000, but have still not signed off 2001.  Their deadline is Irish Stock Exchange imposed – June 30.  They recently collected the company reports we requested from the IM.  If PwC decide not to sign, our mission is clear – resign immediately.  Declan is in touch with them, but they don't seem to be in any hurry and the May 31 NAV cycle looms.

·        If PwC do sign, we should still consider our exit strategy, but by doing is likely to create shock-waves that could cause significant distress, and our association will not be pretty.

We will keep you posted – comments welcome.

Rgds, William

165.    Keunen, acting within his express authority and in the scope of his employment as a director of The Citco Group, even admits that Citco's "personal directors" performed for and at the direction of The Citco Group and Citco N.V. when they served on the Funds boards. Keunen's observation that Citco's association with Lancer and Lauer "will not be pretty" is prophetic, and further demonstrates the Defendants' scheme to accept inflated fees based on the Funds' inflated valuations.

166.    In response, Smeets, CEO of The Citco Group wrote to Keunen, Quilligan, Conroy, and all of The Citco Group Executive Directors:

From:        Smeets, Christopher, G.
Sent:        Thursday, May 23, 2002 8:51 AM

To:                   Keunen, William MIA; zz*Citco All Executive Directors
Cc:                   Quilligan, Declan CUR; Verhorren, John LON; Conroy, Kieran DUB, Peller, Jay
NYC

Subject:          RE:  Lancer
Let's develop a quit [sic] exit scenario,

CGS

167.    In response to CEO of The Citco Group's directive for Citco to extricate

themselves from the administration of the Offshore Funds after their knowing, willful, reckless,

and grossly negligent breaches of the above-stated duties of care, fiduciary duties, and

obligations to the Offshore Funds, Verhooren, a director of The Citco Group, wrote to Keunen,

the Director of Fund Services of The Citco Group:

From:             John Verhooren GEN
Sent:             Thursday, May 23, 2002 8:56 AM
To:                Keunen, William MIA
Subject:          RE:  Lancer

William,

they manipulated the price by executing small portions, not large ones.  That makes the smell of
fraud even worse.  While they have position of 2.5 mln shares in Method Prods, they buy 500
shares to bring the price from $3 to $5.  I think you have to convince the board that a quick exit
is indeed the way to go, but that won't save us from a big falout [sic].  They should know the
shareholders are all big players in the market.  (the same guy that tell everybody that they have
such wonderful due dilligence [sic] systems and procedures in place!)

John

168.    Plainly, this litany of emails demonstrates that The Citco Group dominated and

controlled Citco N.V.'s administration of the Offshore Funds to the point of disregarding its

corporate existence by scheming about their purported "exit strategy" in hopes to escape liability

for the Defendants and the various Citco Directors' knowing, willful, reckless, and/or grossly

negligent breaches of the above-stated duties, fiduciary duties and obligations to the Offshore

Funds.

169.    Furthermore, the emails show that Lauer's manipulation and inflation of the Funds' NAV was easily discoverable had the Defendants fulfilled their duties of care owed to the Offshore Funds.  This series of communications also plainly demonstrates that the Defendants either possessed the information that established the invalidity of Lauer's valuations or such information was readily available and they ignored it until they were faced with potential liability for their knowing, willful, reckless, and/or grossly negligent breaches of duties owed to the Funds.

170.    Keunen, acting within his express authority and in the scope of his employment as a Director of Fund Services for The Citco Group, followed this up with discussions with Jay Peller ("Peller") of the New York City Citco operations.  Peller agreed to check with Tudor Investments, an investment management group, to see if their people had heard of any of the companies in question.

171.    Rather than passing their conclusions along to the Independent Directors, investors, or appropriate authorities as to the Offshore Funds' true condition, the Defendants instead continued plotting for their own exit as fund administrator.  The issues with the Offshore Funds were discussed and decided at The Citco Group's highest level – its executive committee, at a meeting in New York City in May 2002.  These e-mails show The Citco Group's complete disregard for corporate formalities, the control and domination of Citco N.V. by The Citco Group, The Citco Group's acknowledgements and representations that Citco N.V. would act on its behalf, and the complete failure of the Defendants to live up to their duties and obligations. The e-mails state:

```
From:       Keunen, William  MIA
Sent:       Tuesday, May 28, 2002
To:    Peller, Jay NYC; Barten, Dre  NYC; Conroy, Kieran  DUB; Verhooren, John  GEN
Cc:    Quilligan, Declan  CUR
```

Subject:        RE: Pause for thought…

The other topic for the EC in NY this week will be Lancer – we need to have our strategy in place.  I know that Jay was speaking to people at Tudor on that – plus did we receive any more reports Declan?
They have also requested a copy of the watch-list – Declan, could you work on that based on what we discussed last week – plus any updated information?
Thks, William

*        *        *

From:           Verhooren, John  GEN
Sent:           Wednesday, May 29, 2002 5:15 AM
To:      Quilligan, Declan  CUR; Keunen, William  MIA; Peller,      Jay  NYC; Barten, Dre  NYC; Conroy, Kieran  DUB
Subject:        RE:  Pause for thought…

Declan,
any news from PWC?

I think their signing off is crucial.  If they don't, all will come out and we will get the blame since it will be perceived that we never saw or reported it.  This would be very bad news for us.  If they sign off, we still have time for an exit scenario.  I think we should consider reporting this to whichever (US) authority could be responsible for this.  At least that way it looks like we uncovered the problems.  We have been following the accounting guide lines by taking the prices from official sources, but because of our internal controls and because of the good work of our internal audit and compliance department we uncovered this 'fraud.' (If we do this, obviously we should be 100% sure that it is fraud).
We probably should ask legal advice in any case as soon as possible.  I don't think we need more valuation books to get more confirmation about the situation.
regards,
John

*        *        *

From: Quilligan, Declan  CUR
Sent:  Wednesday, May 29, 2002 12:11 PM
To:      Verhooren, John  GEN; Keunen, William  MIA; Peller,      Jay  NYC; Barten, Dre  NYC; Conroy, Kieran  DUB
Subject:        lancer

I received this email this morn.  I have also scanned the introductory page to Stenton Leigh, the valuation firm which Lancer has used (has anybody heard from them) which I took from the internet.
After we receive what is mentioned below I believe we/PWC will have valuation books for the 6 largest positions.

Now that we have the name of the valuation firm I suggest I ask Lancer can we contact them direct, if they refuse we should resign because we cannot work properly under such restrictions. If they accede then we can ascertain if the valuation books we received are fully the work of Stenton Leigh and whether they fully stand over the valuations, their name is not mentioned in the valuation books or if it is I have not seen it.  If they do stand over them it's a plus, its an independent party with industry expertise certifying the valuations, if they don't the whole thing has been a non-exercise and again on that basis we should resign.  I think it is clear at this stage that our view is that the positions should be haircutted.  If the IM is not prepared to revalue them then because our comfort level has been reduced we should resign.  We should get legal advice before we confront the IM for a face to face high level discussion on the matter of haircutting because at this meeting it would have to be a "if you don't do this we will walk" situation.  I think if we go this route and have this meeting we should look for an explanation of some of the small trades at end of month that appear to make little sense to us.  We should get legal advice on that too.  If the explanation don't [sic] make any sense then we might have obligations.  Once we resign we will need legal advice as regards our notice to shareholders.

As regard PWC we gave them the valuation books which Gino himself is examining.  I spoke to Gino and he will be looking for more back up as regards what was contained in the booklets. They have some issues wrt price decreases subsequent to year end which they want answers on. This process will drag on for another few weeks I believe and I think if they don't get the responses they need they will qualify the report.

172.    Only in connection with manufacturing their own "exit scenario," did the

Defendants begin accumulating details and information regarding the true dire state of the Target

Companies, the absurd valuations and the end-of-period trades.  The Defendants never acted to

protect the Offshore Funds or their investors, but instead only acted for their own benefit and to

protect themselves when they resigned.  Lauer and the insiders had been utilizing the same bogus

valuation scheme since at least 1999, and the Defendants had actual knowledge of this scheme

and/or willfully disregarded Lauer's scheme by ignoring the "red flags."  By this point, however,

the damage to the Offshore Funds had already been done, as reflected by the following email:

From:  Quilligan, Declan     CUR [Dquilligan@citco.com]
Sent:   Thursday, June 06, 2002 3:11 PM
To:     Bruce Cowen (E-mail); Michael Lauer
Subject:        Conference call this morning

Michael, Bruce,
As per our conversation the positions that we are most concerned about are the positions that have little cost attached and very significant market values relative to the overall value of the portfolio.

These positions are
AUG Corp
Fidelity First Financial Corp
Method Products, both common stock and warrants
Nu-D-Zine Bedding & Bath Inc, both common stock and warrants
SMX Corp
Total Film Group
Expression Graphics

We have Stenton Leigh valuation booklets that you have sent to us.  However what we would like to obtain in order to gain comfort as to the valuations is a memorandum from yourself as Investment Manager detailing to ourselves, PriceWaterhouse Coopers and the directors of the Fund, specific relevant information as to events that will propel liquidity in order that the current valuation of these investments will be realised.  I would further like to have you detail your current thinking on your exit strategy from these positions.
As regards the trades that we mentioned this morning, can you please detail in written form the reasons for the small trades involving purchase of Method Products stock on March 27, 2002 and March 28, 2002 for blocks of 500 shares at a price of $5.00 and $5.85 respectively.
Furthermore, as regards warrant valuations, we had seen a valuation placed on Nu-D-Zine warrants as of November 30, 2001 of $50m.  In December, we see a significant portion of these warrants leaving the portfolio for no gain.  Again, we would like your assessment of this situation.
I would appreciate receiving this information on an urgent basis.
Regards

Declan.

173.    After PriceWaterhouse Coopers ("PwC") signed off on the Funds' NAV in 2002, Keunen, acting with his express authority and in the scope of his employment as Director of Fund Services of The Citco Group, engaged in an email exchange with the Executive Directors of The Citco Group, which included The Citco Group's CEO, Smeets.  In discussing Citco's resignation as the Offshore Funds' administrator, Keunen noted, "[I]f we do resign, we need to decide what type of communication is sent to the investors (We also forego $700K in fees)."

174.    Accordingly, The Citco Group (via their respective director and officer Keunen) admitted they had a direct interest in receiving the inflated administrative fees from the Funds, despite their actual knowledge that their administrative fees were based on patently false and inflated NAV's.  The Citco Group disregarded Citco N.V.'s corporate formalities and used Citco

N.V. as its alter ego for the improper purpose of inflating The Citco Group's fees.  Alternatively, Citco N.V. served as The Citco Group's agent because The Citco Group (via its director and officer Keunen) dominated and controlled Citco N.V.'s administration of the Offshore Funds.

175.    At the time of Citco N.V.'s resignation as Administrator for the Funds, the Defendants compounded their breaches by colluding with Lauer and Lancer Management to conceal the acknowledged reason for their resignation - that Citco was scrambling to escape liability for their knowing, willful, reckless and/or grossly negligent breaches of the above-stated duties of care, fiduciary duties, and obligations to the funds.  The decision for Citco N.V. to resign was made by the Executive Directors of The Citco Group.  Smeets, the President and CEO of The Citco Group, emailed the decision of The Citco Group's Executive Directors to Keunen on July 4, 2002, which stated:

From:        Smeets, Christopher G.
Sent:        Thursday, July 04, 2002, 4:56 AM
To:          Keunen, William MIA: zz*Citco All Executive Directors
Subject:     Re:  Lancer

William:

We Robert, Ermanno, Hans & I, have discussed and we feel we do not need to wait for Paul Schrieber's opinion.  We should resign as we discussed by phone.  Call either Ermanno or myself for detailed reasoning, but essentially it is what you and I discussed.  We cannot hide behind PWC, and when [sic] do not wish to be associated with the fund when it goes own [sic]. plus we do our duty in a way by giving the investors a signal albeit maybe to [sic] late.  We resign because they do nor [sic] comply with our pricing policy.

CGS

176.    Soon thereafter, Keunen, acting within his express authority and in the scope of his employment as Director of Fund Services of The Citco Group, notified Lancer Management of "our decision to resign as Administrator of Lancer Offshore."  He communicated the fact that he had resigned on behalf of Citco to all of The Citco Group's Executive Directors.  Notably,

Keunen was not employed by Citco N.V. at this time.  Ermanno Unternaehrer, a director on The Citco Group's Executive Committee, responded that the draft Transition Agreement was "a good start," and also confirmed his knowledge that "this is the fund where there were suspicions of stock manipulation."   Again, The Citco Group disregarded Citco N.V.'s corporate formalities and exercised pervasive control over Citco N.V., which served as its alter ego and/or agent.

177.    Contrary to Smeets' suggested "signal" to investors, the Transition Agreement between Citco N.V., Offshore, and Lancer Management, which was reviewed and commented upon by the Executive Directors of The Citco Group, provides that each party agrees "not to make any public statements regarding the other party or any disparaging statement … regarding the other party."   In addition, the Transition Agreement provided specific language for use in responding to inquiries regarding Citco's termination as "Administrator."   The required statement is as follows:

> Citco and the Company have mutually and amicably agreed, on the termination of the Administrative Agreement between Citco and the Company and, together with the investment manager and its principal, have entered into a Transition Agreement to facilitate a smooth transition to a new administrator.

178.    In signing the Transition Agreement, Keunen, Quilligan, and Conroy agreed to be bound by the "inquiries statement" and the "non-disparagement" provisions of the Transition Agreement.  Significantly, Keunen, who is a director of The Citco Group, was a party to the Transition Agreement, demonstrating The Citco Group's pervasive control over Citco N.V. and The Citco Group's acknowledgment and representation to the Funds that Citco N.V. was acting on its behalf as its agent.  Moreover, this shows that The Citco Group disregarded Citco N.V.'s corporate form.  When the resignation of Citco N.V. was disclosed to the Offshore investors in a letter signed by Quilligan and Conroy, the letter conformed to the statement above and made no

mention of inflated NAV's, inflated management and administrative fees, inadequate support for valuations, the small, seemingly purposeless end-of-period trades to inflate values of the Funds' NAV's, or any of the other information relating to the problematic valuations of the Funds of which the Defendants were aware.

179.    The Defendants benefited from the Offshore Funds' inflated valuations because their administrative fees were directly tied to the overstated value of the NAV.  As the Offshore Funds' NAV increased without basis in fact or reality, the Defendants' administrative fees correspondingly increased.

180.    The Target Companies were used by Lauer to inflate the purported NAV of the Offshore Funds and, as a result, the fees paid by the Offshore Funds to Lauer, Lancer Management, and the Defendants.  Lauer's conduct resulted in the overpayment in the tens of millions of dollars of management, incentive, and administrative fees to Lancer Management and to the Defendants.  These "false profit" fee payments harmed the Offshore Funds by draining the Offshore Funds of value.  The inflated values also leant credibility to Lauer and prolonged the life of the Offshore Funds, despite hopeless and deepening insolvency, solely for the purpose of generating fees payable to Lancer Management, Lauer, and the Defendants.

181.    The Defendants knew about or recklessly disregarded the grossly over-inflated valuations of the Target Companies as well as the excessive accumulation of equity positions in the Target Companies, since the Defendants had obligations to the Offshore Funds to discover and take appropriate steps to prevent Lauer's continuing depletion of the Offshore Funds. Instead, the Defendants' gross negligence was an essential element of Lauer's ability to do so. Lauer would not have been able to prolong the life of the Offshore Funds and continue depleting them of value but for the gross negligence of the Defendants.  Moreover, the Defendants had a

direct pecuniary interest in the overstated NAV's, which corresponded to the amount of their inflated administrative fees paid by the Offshore Funds.

182.    The Defendants knowingly, willfully, recklessly, and/or with gross negligence breached their above-stated duties of care, fiduciary duties and obligations to the Offshore Funds by knowingly approving and/or acquiescing in Lauer's conflicted and baseless valuations  for their own pecuniary gain, by disseminating the patently false inflated NAV's to investors and the Offshore Funds, by failing to exercise even a minimum of due diligence, by failing to disclose the inflated valuations to the Independent Directors, the appropriate authorities, or the investors, and by failing to speak accurately about the value of the Offshore Funds' NAV.  Instead, they were more concerned about avoiding their own exposure and responsibility for the Offshore Funds' problems.

183.    The Defendants had actual knowledge of the wrongfulness of Lauer's and the insiders' conduct based on the absurd valuations, the "red flags," and conflicts of interest and also of the high probability that injury or damage would result from it and/or that their conduct placed the Offshore Funds in clear and present danger that was likely to result in grave injury to the Offshore Funds.

184.    But for the Defendants' gross negligence, willful misconduct and/or reckless disregard for their duties, the Defendants could not have continued to collect grossly inflated administrative fees.

**D.  The Citco Group, Citco N.V. and CAC are Vicariously Liable to the Offshore Funds**

185.    The Citco Group, Citco N.V., and CAC are vicariously liable to the Offshore Funds.  First, Citco N.V. and CAC served as The Citco Group's actual and apparent agents, and CAC also was the actual and apparent agent of Citco N.V..  Second, CAC served as the alter ego

and mere instrumentality of The Citco Group and Citco N.V., so that The Citco Group's and Citco N.V.'s corporate veils may be pierced. Third, Citco N.V. served as the alter ego and mere instrumentality of The Citco Group, so that The Citco Group's corporate veil may be pierced.

1. **Actual Agency**

186. Citco N.V. served as The Citco Group's actual agent. The Citco Group acknowledged to the Offshore Funds that Citco N.V. would act on its behalf by (1) an express understanding between Citco N.V. and The Citco Group that Citco N.V. would act on its behalf in administering the Offshore Funds, (2) Keunen's decision-making and pervasive control and domination over Citco N.V.'s administration of the Offshore Funds (Citco N.V. was the only entity that endorsed the Citco Agreements to administer the Funds), while he acted in his express authority as Director of Fund Services of The Citco Group, and (3) The Citco Group's placement of its own employees, Verhooren and Stocks, on the boards of the Offshore Funds. Any and all of these acts by The Citco Group acknowledged to the Offshore Funds that Citco N.V. had authority to act on The Citco Group's behalf in administering the Offshore Funds.

187. Citco N.V. expressly accepted the undertaking to serve as The Citco Group's actual agent.

188. As more fully detailed below, The Citco Group exercised pervasive control and dominated Citco N.V., its actual agent. Specifically, Keunen, who was acting within his express authority as Director of Fund Services of The Citco Group, exercised pervasive control over Citco N.V. because Keunen knowingly ordered Citco N.V. to send out the erroneous NAV, and drafted a memorandum to Smeets, CEO of The Citco Group, relating to Citco N.V.'s resignation and the strategy to cover-up Citco's misconduct and to avoid liability for all Citco entities that actively participated in the willful, wanton, and/or grossly negligent misconduct and breaches of

duties toward the Funds.  Further, Keunen controlled Citco N.V.'s appointment of the Funds' board members by selecting Citco's employees to serve as directors of the Offshore Funds.

189.   CAC also served as The Citco Group's actual agent.  The Citco Group acknowledged to the Offshore Funds that CAC would act on its behalf because The Citco Group authorized CAC to collect fees from the Offshore Funds for The Citco Group's and/or Citco N.V.'s services to the Funds despite the fact that CAC was not a party to the various administrative services contracts between Citco N.V. and the Offshore Funds.  As stated herein, The Citco Group directly controlled Citco N.V.'s administration of the Offshore Funds.

190.   CAC expressly accepted the undertaking to serve as The Citco Group's actual agent by continuously and systematically performing services for the Offshore Funds, including the improper collection of fees for The Citco Group's and/or Citco N.V.'s services from the Offshore Funds.

191.   The Citco Group exercised pervasive control and dominated CAC, its actual agent.  Specifically, The Citco Group knowingly ordered CAC to accept payments from the Offshore Funds on The Citco Group's behalf and for The Citco Group's and/or Citco N.V.'s services to the Funds.

192.   CAC also served as Citco N.V.'s actual agent.  Citco N.V. acknowledged to the Offshore Funds that CAC would act on its behalf because Citco N.V. authorized CAC to collect fees from the Offshore Funds for Citco N.V.'s services to the Funds despite the fact that CAC was not a party to the various administrative services contracts between Citco N.V. and the Offshore Funds.

193.   CAC expressly accepted the undertaking to serve as Citco N.V.'s  actual agent by continuously and systematically performing services for the Offshore Funds, including the

improper collection of fees for Citco N.V.'s services from the Offshore Funds.

194.    Citco N.V. exercised pervasive control and dominated CAC, its actual agent. Specifically, Citco N.V. knowingly permitted CAC to accept payments from the Offshore Funds on Citco N.V.'s behalf and for Citco N.V.'s services to the Funds.

## 2.    **Apparent Agency**

195.    Citco N.V. served as The Citco Group apparent agent because The Citco Group created the appearance of an agency relationship to the Offshore Funds.

196.    Keunen, while acting within his express authority as Director of Fund Services of The Citco Group, represented to the Offshore Funds that Citco N.V. served as The Citco Group's agent.  These representations were in the form of Keunen repeatedly communicating with the Offshore Funds and their board members, thereby directly representing that Citco N.V. was acting as an agent on behalf of The Citco Group.  Significantly, Keunen was not at any relevant time employed by Citco N.V.  Moreover, Keunen controlled Citco N.V.'s administration of the Offshore Funds, which constituted a direct acknowledgment to the Funds that Citco N.V. was acting on behalf of The Citco Group at all times because Citco N.V. was the only entity that had endorsed the various Citco administrative services agreements.  Further, Keunen represented to the Funds that Citco N.V. served as The Citco Group's agent by selecting and appointing employees and a subsidiary from The Citco Group to serve as directors of the Funds.

197.    Specifically, The Citco Group, via its director Keunen, and via The Citco Group's director Stocks, and employee Verhooren, represented to the Offshore Funds that Citco N.V. had the authority to act on its behalf because they regularly participated and intervened in the administration of the Offshore Funds.  These representations include, without limitation, (1) controlling Citco N.V.'s administration of the Offshore Funds, (2) communicating on behalf of

Citco N.V. with Lauer and Lancer, (3) directing the dissemination of the inflated NAV, (4) formulating and implementing the inflated valuations of the Offshore Funds, (5) responding to investor inquiries, (6) communicating with the Offshore Funds' auditor regarding valuation issues, and (7) selecting and appointing Citco employees from various Citco entities as directors of the Funds.

198.    The Offshore Funds reasonably relied on The Citco Group's representations regarding Citco N.V.'s authority to act on their behalf.  The Citco Group did nothing to dispel the Offshore Funds' perception that Citco N.V. acted on behalf of The Citco Group during their course of dealing, as set forth above.

199.    As a result, the Offshore Funds detrimentally changed position in reliance on The Citco Group's representations that Citco N.V. would act on their behalf by continuing the employment of Citco N.V. based on Citco's reputation as a valuation expert (despite Citco's active participation and scheme to inflate the Funds' NAV) and by relying on the erroneous inflated NAV's provided by Citco, which resulted in the Funds' deepening insolvency and damaged the Funds.  Furthermore, the Offshore Funds relied heavily on the acknowledgment that Citco N.V. was acting on behalf of The Citco Group due to their business acumen and industry reputation.

200.    CAC also served as The Citco Group's apparent agent because The Citco Group created the appearance of an agency relationship to the Offshore Funds.

201.    The Citco Group represented to the Offshore Funds that CAC served as The Citco Group's agent.  These representations were in the form of The Citco Group authorizing CAC to collect fees on The Citco Group's behalf and for The Citco Group's and/or Citco N.V.'s services to the Offshore Funds.  The Citco Group authorized CAC to collect these fees despite the fact

that CAC was not even a party to the various administrative services agreements that Citco N.V. had entered into with the Offshore Funds.

202.   The Offshore Funds reasonably relied on The Citco Group's representations regarding CAC's authority to act on its behalf.  The Offshore Funds paid these various fees to CAC in reliance on The Citco Group's representations and The Citco Group did nothing to dispel the Offshore Funds' perception that CAC acted on its behalf during their course of dealing as set forth herein.

203.   As a result, the Offshore Funds detrimentally changed position in reliance on The Citco Group's representations that CAC would act on its behalf by continuing to make payments to CAC for The Citco Group's and/or Citco N.V.'s services to the Offshore Funds.  The Offshore Funds continued to make these payments based on Citco's reputation as a valuation expert (despite Citco's active participation and scheme to inflate the Funds' NAV) and by relying on the erroneous inflated NAV's provided by Citco, which resulted in the Funds' deepening insolvency and damaged the Funds.

204.   CAC also served as Citco N.V.'s apparent agent because Citco N.V. created the appearance of an agency relationship to the Offshore Funds.

205.   Citco N.V. represented to the Offshore Funds that CAC served as Citco N.V.'s agent.  These representations were in the form of Citco N.V. authorizing CAC to collect fees  on Citco N.V.'s behalf for Citco N.V.'s services to the Offshore Funds.  Citco N.V. authorized CAC to collect these fees despite the fact that CAC was not even a party to the various administrative services agreements that Citco N.V. had entered into with the Offshore Funds.

206.   The Offshore Funds reasonably relied on Citco N.V.'s representations regarding CAC's authority to act on its behalf.  The Offshore Funds paid these various fees to CAC in

reliance on Citco N.V.'s representations and Citco N.V. did nothing to dispel the Offshore Funds' perception that CAC acted on its behalf during their course of dealing as set forth herein.

207.    As a result, the Offshore Funds detrimentally changed position in reliance on Citco N.V.'s representations that CAC would act on its behalf by continuing to make payments to CAC for Citco N.V.'s services to the Offshore Funds.  The Offshore Funds continued to make these payments based on Citco's reputation as a valuation expert (despite Citco's active participation and scheme to inflate the Funds' NAV) and by relying on the erroneous inflated NAV's provided by Citco, which resulted in the Funds' deepening insolvency and damaged the Funds.

**3.    Piercing the Corporate Veil**

208.    Citco N.V. is the alter ego and mere instrumentality of The Citco Group.

209.    As demonstrated herein, The Citco Group wholly disregarded Citco N.V.'s corporate personality and dominated and controlled Citco N.V.'s actions in administering the Offshore Funds.

210.    The Citco Group used Citco N.V. for improper purposes, including without limitation, ordering Citco N.V. to send out erroneous NAV's, and via Keunen, directly participating in the Offshore Funds' administration to wrongfully inflate their administration fees that were directly linked to the bogus NAV's, and selecting and directing the appointment of Citco N.V. employees, Conroy and Quilligan, and The Citco Group's employees, Verhooren and Stocks to serve as directors of the Funds to approve and/or acquiesce in Lauer's inflated valuations that inured to Citco's financial benefit as detailed in this Third Amended Complaint.

211.    CAC is the alter ego and mere instrumentality of The Citco Group.

212.    As demonstrated herein, The Citco Group wholly disregarded CAC's corporate

personality and dominated and controlled CAC's actions in administering the Funds.

213.    The Citco Group used CAC for improper purposes, including without limitation, the improper collection of fees for its services from the Offshore Funds.

214.    CAC is the alter ego and mere instrumentality of Citco N.V.

215.    As demonstrated herein, Citco N.V. wholly disregarded CAC's corporate personality and dominated and controlled CAC's actions in administering the Funds.

216.    Citco N.V. used CAC for improper purposes, including without limitation, the improper collection of fees for its services from the Offshore Funds.

**E.    The Transfers at Issue**

217.    Lauer caused the Offshore Funds to make transfers to Citco N.V. and CAC, as detailed on the attached **Exhibit "A,"** which is incorporated herein by reference.

218.    The basis for all or most of these transfers was to pay directors fees and inflated administrative fees, based on the overstated NAV's of the Offshore Funds**.**

219.    Upon information and belief, CAC received the transfers upon the direction of Citco N.V. and/or The Citco Group.

220.    CAC received the transfers for the benefit of Citco N.V. and/or The Citco Group.

221.    The moneys transferred to Citco N.V., CAC and The Citco Group may have been dissipated.

222.    As of the time of the filing of this Third Amended Complaint, additional property transferred to the Defendants may still be in their possession or control.

223.    Each of the Defendants received the benefits of the transfers due to the Defendants' failure to observe corporate formalities and due to its integrated nature as a global hedge fund administrator.

224.    As of the date of the transfers, the Receivership Order, and the date of this Third Amended Complaint, a creditor existed that could have avoided the transfers under applicable law.

225.    Accordingly, the Receiver hereby sues each of the Defendants to recover the transfers identified on the attached **Exhibit "A"** and all other transfers by any of the Receivership Entities to each of the Defendants (collectively the "Transfers") as may be determined through discovery.

**COUNT I**
**ACTUAL FRAUDULENT TRANSFER**

**Fla. Stat. §§ 726.105(1)(a) and 726.108 and other applicable law**

226.    The Receiver incorporates by reference the allegations set forth in Paragraphs 1 through 225 above.

227.    Each of the Receivership Entities identified in Column 1 of **Exhibit "A"** made the Transfers identified in Column 4 of **Exhibit "A"**  to the Defendant identified in Column 2 of **Exhibit "A"** on the dates specified in Column 3 of **Exhibit "A.**

228.    In each instance, Lauer caused the specified Receivership Entity to make the specified Transfer with the actual intent to hinder, delay, and defraud the creditors of the specified Receivership Entity**.**

229.    With respect to transfers made to CAC, the Receiver seeks to recover from (i) CAC, on the basis that (a) it is the initial transferee that received the transfers, or alternatively, (b) it is the party for whose benefit the initial transfers were made; (ii) Citco N.V., on the basis that (a) it is the party for whose benefit the initial transfers were made; (b) it is a subsequent transferee; or alternatively, (c) it is vicariously liable for the transfers made to CAC; and/or (iii)

The Citco Group, on that basis that: (a) it is the party for whose benefit the initial transfers were made; (b) it is a subsequent transferee, or alternatively, (c) it is vicariously liable for the transfers made to CAC.

230.    With respect to transfers made to Citco N.V., the Receiver seeks to recover from (i) Citco N.V., on the basis that (a) it is the initial transferee that received the transfers, or alternatively, (b) it is the party for whose benefit the initial transfers were made; (ii) The Citco Group, on the basis that (a) it is the party for whose benefit the initial transfers were made; (b) it is a subsequent transferee; or alternatively, (c) it is vicariously liable for the transfers made to Citco N.V; and/or (iii) CAC, on the basis that (a) it is the party for whose benefit the initial transfers were made; (b) it is a subsequent transferee, or alternatively, (c) it is vicariously liable for the transfers made to Citco N.V.

**WHEREFORE**, the Receiver demands judgment against the Defendants, in the total amount of all Transfers, including those set forth on **Exhibit "A**", plus any other transfers determined through discovery or otherwise, together with prejudgment interest from the date of each of the Transfers, costs, all the relief set forth in Fla. Stat. § 726.108 and other applicable law and any further relief that this Court deems just, fair, and equitable.

**COUNT II**
**CONSTRUCTIVE FRAUDULENT TRANSFER**

**Fla. Stat. §§ 726.105(1)(b) and 726.108 and other applicable law**

231.    The Receiver incorporates by reference those allegations set forth in Paragraphs 1 through 230 above.

232.    Each of the Receivership Entities identified in Column 1 of **Exhibit "A"**  made the Transfers identified in Column 4 of **Exhibit "A"** to or for the benefit of the Defendant identified in Column 2 of **Exhibit "A"** on the dates specified in Column 3 of **Exhibit "A."**

233.    In each instance, the Receivership Entity that made the Transfer did not receive reasonably equivalent value in exchange for the Transfer.

234.    In each instance, the Receivership Entity that made the Transfer was insolvent at the time the Transfer was made.

235.    In each instance, the net assets of the Receivership Entity that made the Transfer were unreasonably small in relation to the Transfer.

236.    In each instance, at the time the Transfer was made, Lauer knew or should have known that the Receivership Entity that made the Transfer was insolvent, and would not be able to satisfy its liabilities as they came due.

237.    In each instance, at the time the Transfer was made, the Receivership Entity that made the Transfer was engaged in, or was about to engage in, a business or a transaction for which the remaining assets of the Receivership Entity were unreasonably small in relation to the business or transaction.

238.    In each instance, at the time the Transfer was made, Lauer knowingly caused the Receivership Entity to incur, or reasonably should have known that the Receivership Entity would incur, debts beyond its ability to pay as they came due.

239.    With respect to transfers made to CAC, the Receiver seeks to recover from (i) CAC, on the basis that (a) it is the initial transferee that received the transfers, or alternatively, (b) it is the party for whose benefit the initial transfers were made; (ii) Citco N.V., on the basis that (a) it is the party for whose benefit the initial transfers were made; (b) it is a subsequent transferee; or alternatively, (c) it is vicariously liable for the transfers made to CAC; and/or (iii) The Citco Group, on that basis that: (a) it is the party for whose benefit the initial transfers were made; (b) it is a subsequent transferee, or alternatively, (c) it is vicariously liable for the transfers

made to CAC.

240.    With respect to transfers made to Citco N.V., the Receiver seeks to recover from (i) Citco N.V., on the basis that (a) it is the initial transferee that received the transfers, or alternatively, (b) it is the party for whose benefit the initial transfers were made; (ii) The Citco Group, on the basis that (a) it is the party for whose benefit the initial transfers were made; (b) it is a subsequent transferee; or alternatively, (c) it is vicariously liable for the transfers made to Citco N.V; and/or (iii) CAC, on the basis that (a) it is the party for whose benefit the initial transfers were made; (b) it is a subsequent transferee, or alternatively, (c) it is vicariously liable for the transfers made to Citco N.V.

**WHEREFORE**, the Receiver demands judgment against each Defendant, in the total amount of the Transfers**,** including those set forth on **Exhibit "A,"**, plus those identified through discovery or otherwise,  together with prejudgment interest from the date of the Transfers, costs, all the relief set forth in Fla. Stat. § 726.108 and other applicable law and any further relief that this Court deems just, fair, and equitable.

### COUNT III
### CONSTRUCTIVE FRAUDULENT TRANSFER

**Fla. Stat. §§ 726.106(1) and 726.108 and other applicable law**

241.    The Receiver incorporates by reference those allegations set forth in Paragraphs 1 through 240 above.

242.    Each of the Receivership Entities identified in Column 1 of **Exhibit "A"**  made the Transfers identified in Column 4 of **Exhibit "A"** to or for the benefit of the Defendant identified in Column 2 of **Exhibit "A** on the dates specified in Column 3 of **Exhibit "A."**

243.    In each instance, the Receivership Entity that made the Transfer did not receive reasonably equivalent value in exchange for the Transfer.

244.    In each instance, the Receivership Entity that made the Transfer was insolvent at the time the Transfer was made, or became insolvent as a result of the Transfer.

245.    With respect to transfers made to CAC, the Receiver seeks to recover from (i) CAC, on the basis that (a) it is the initial transferee that received the transfers, or alternatively, (b) it is the party for whose benefit the initial transfers were made; (ii) Citco N.V., on the basis that (a) it is the party for whose benefit the initial transfers were made; (b) it is a subsequent transferee; or alternatively, (c) it is vicariously liable for the transfers made to CAC; and/or (iii) The Citco Group, on that basis that: (a) it is the party for whose benefit the initial transfers were made; (b) it is a subsequent transferee, or alternatively, (c) it is vicariously liable for the transfers made to CAC.

246.    With respect to transfers made to Citco N.V., the Receiver seeks to recover from (i) Citco N.V., on the basis that (a) it is the initial transferee that received the transfers, or alternatively, (b) it is the party for whose benefit the initial transfers were made; (ii) The Citco Group, on the basis that (a) it is the party for whose benefit the initial transfers were made; (b) it is a subsequent transferee; or alternatively, (c) it is vicariously liable for the transfers made to Citco N.V; and/or (iii) CAC, on the basis that (a) it is the party for whose benefit the initial transfers were made; (b) it is a subsequent transferee, or alternatively, (c) it is vicariously liable for the transfers made to Citco N.V.

**WHEREFORE**, the Receiver demands judgment against each Defendant, in the total amount of the Transfers**,** including those set forth on **Exhibit "A,"** plus those identified through discovery or otherwise,  together with prejudgment interest from the date of the Transfers, costs, all the relief set forth in Fla. Stat. § 726.108 and other applicable law and any further relief that this Court deems just, fair, and equitable..

## COUNT IV
## <u>UNJUST ENRICHMENT</u>

247.     The Receiver incorporates by reference those allegations set forth in Paragraphs 1 through 246 above.

248.     In each instance, the Defendant that (a) received the Transfers, or (b) for whose benefit the Transfers were made, has been unjustly enriched at the expense of the (x) Receivership Entity from which it received the Transfers, or (y) the creditors of such Receivership Entity (including other Receivership Entities), by receiving the Transfers.

249.     In each instance, it would be inequitable to permit the Defendant that (a) received the Transfers, or (b) for whose benefit the Transfers were made, to retain the benefit of the Transfers, because all of the Transfers consisted of investors' misappropriated capital contributions to one or more of the Receivership Entities.

250.     Additionally, in each instance, it would be inequitable to permit the Defendant that (a) received the Transfers, or (b) for whose benefit the Transfers were made, to retain the benefit of the Transfers, because the Receivership Entity that made the Transfers did not receive reasonably equivalent value in exchange for the Transfers.

251.     In each instance, the Defendant that (a) received the Transfers, or (b) for whose benefit the Transfers were made, is not entitled to retain the Transfers, because the Transfers were obtained from the Receivership Entities as a result of Lauer's misconduct.

252.     In each instance, it would be inequitable to permit the Defendant that (a) received the Transfers, or (b) for whose benefit the Transfers were made, to retain the benefit of the Transfers, at the expense of (x) the Receivership Entity from which it received the Transfers, or (y) the creditors of such Receivership Entity (including other Receivership Entities).

253.     To the extent the CAC, Citco N.V. and/or The Citco Group is vicariously liable

for the acts of another Defendant, they are liable under this count, too.

254.    The Receiver does not have an adequate remedy at law and is therefore entitled to relief under the equitable doctrine of unjust enrichment.[11]

**WHEREFORE**, the Receiver demands judgment against each Defendant, in the total amount of (a) all Transfers received by such Defendant, (b) all Transfers made for the benefit of such Defendant, and/or (c) the full amount for which such Defendant has vicarious liability, together with prejudgment interest from the date of each of the Transfers, costs, and any further relief that this Court deems just, fair, and equitable.

Dated: February 12, 2010

**HUNTON & WILLIAMS LLP**
*Attorneys for the Receiver*
1111 Brickell Avenue
Suite 2500
Miami, Florida 33131
Telephone: (305) 810-2500
Telecopier: (305) 810-2460


By:  /s/ Andrew D. Zaron
     Andrew D. Zaron (FBN 965790)
     David E. Bane (FBN 515701)

---

[11] The Receiver pleads this equitable claim in the alternative to its legal claims.